832 So.2d 1 (2001)
ACCEPTANCE INSURANCE COMPANY
v.
Gloria BROWN.
Gloria Brown
v.
Acceptance Insurance Company.
1991938 and 1992026.
Supreme Court of Alabama.
June 29, 2001.
*4 Douglas L. Brown, Rodney R. Cate, and Mary Carol Ladd of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, L.L.C., Mobile; and James M. Barnes, Jr., Marion, for appellant/cross appellee Acceptance Insurance Company.
Kenneth W. Hooks and Chris T. Hellums of Pittman, Hooks, Dutton & Hollis, P.C., Birmingham; and Clarence T. Hellums, Jr., of Hellums & Johnson, Centreville, for appellee/cross appellant Gloria Brown.
SEE, Justice.
These consolidated appeals concern a commercial general-liability insurance policy ("CGL") that Acceptance Insurance Company issued to Leo Brown d/b/a G & L Grocery. Leo Brown and his wife Gloria Brown, who was also an "insured" under the policy, sued Acceptance, alleging that it had breached its contract to provide insurance when it refused to defend and indemnify them in a civil action and that Acceptance had breached its contract in bad faith. Only Gloria Brown's claims went to trial. The jury found for Gloria Brown, and the trial court entered a judgment based on the jury verdict. Acceptance appeals. Gloria Brown cross-appeals the trial court's order requiring a remittitur of the jury's awards of compensatory and punitive damages. We affirm conditionally.

I.
In February 1995, Leo and Gloria Brown opened G & L Grocery, a convenience *5 store, in Perry County.[1] Leo purchased a commercial general-liability policy from Acceptance, through the Stoney Vintson Agency.[2]
The policy's "Commercial General Liability Coverage Form" provides, in pertinent part:
"SECTION 1COVERAGES
"COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
"1. Insuring Agreement
"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies. We will have the right and duty to defend any `suit' seeking those damages. We may at our discretion investigate any `occurrence' and settle any claim or `suit' that may result....
"....
"No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTSCOVERAGES A AND B.
"....
"2. Exclusions.
"This insurance does not apply to:
"a. `Bodily injury' or `property damage' expected or intended from the standpoint of the insured. This exclusion does not apply to `bodily injury' resulting from the use of reasonable force to protect persons or property."
Attached to the CGL form was an endorsement containing this "assault-and-battery exclusion":
"It is agreed that the insurance does not apply to Bodily Injury, including death, and/or Property Damage arising out of assault and/or battery or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of you, your employees, patrons or any other person."
By its terms, the endorsement was made part of the Browns' insurance policy.[3]
On March 27, 1995, the Browns were told that R.G. and M.D. were planning to burglarize their store that night. R.G. and M.D. had been in the store that day to trade a tire, a jack, and a tire tool in exchange for a half case of beer and $5.00 worth of gasoline. The record indicates that, at the time the Browns were warned about the possible burglary, there had been previous unsolved incidents of vandalism and stealing at the store.[4]
After closing the store at 7:00 p.m., the Browns went to their home in Maplesville. Over dinner, the Browns decided to return to the store to possibly apprehend any *6 burglars. When the Browns arrived at the store that evening, around 8:30 p.m., they hid their truck in a wooded area several hundred yards from the store. They hid in the pumphouse near the store; Leo was armed with a .30-30 rifle and Gloria was armed with a .32 caliber pistol. According to Leo, they took the guns because they thought R.G. and M.D. might be dangerous. While in the pumphouse, Leo drank three beers.
Around 11:30 p.m., the Browns heard the sound of an automobile engine being started at a house next door to the store and heard voices yelling "whoopy, whoopy." They heard the car being driven from the house over a gravel lot to the store, where the driver stopped and parked it. Leo then left the pumphouse, armed with the .30-30 rifle, and walked around to the front of the store. Before leaving the pumphouse, Leo released the safety mechanism on Gloria's pistol and told her to stay in the pumphouse.
As Leo left the pumphouse, Gloria heard the store's burglar alarm sound. When Gloria heard the alarm, she left the pumphouse and walked toward the highway in front of the store. She testified that she saw Shaun Scott's car and recognized it before she saw either Leo or Scott.[5]
Ultimately, as a result of this encounter, Scott filed a tort action against the Browns. Scott secured a judgment in that action. Then, the Browns filed their action against Acceptance, based on Acceptance's failure to defend and indemnify the Browns in regard to Scott's action against them.
In the Browns' action against Acceptance, Gloria testified that she saw Scott standing with the store's padlock in his hand and that he appeared to be "messing with the front door."[6] Leo called out, "Shaun, what in the hell are you trying to do?" When Scott did not respond, Leo fired two shots that he called "warning shots." The record indicates that the first shot passed behind Scott and hit an ice machine. Leo stated that he fired the first shot to scare Scott away. According to Leo, Scott acted as if he had not heard anything and Leo therefore fired a second warning shot.[7]
After Leo fired the second "warning shot," Scott turned toward Leo and ran to his car. As Scott was getting into his car, Leo approached and tried to hit Scott with the rifle. Instead, Leo hit the frame of the car and broke the stock of the rifle in half. Leo then began poking Scott in the face with the barrel of the rifle. Leo stated that he poked Scott in the face because he thought Scott was trying to reach something under his seat. When Scott tried to get out of his car, Leo hit him on the back of the head with the barrel of the rifle. Leo used a downward swing that almost knocked Scott to the ground. Gloria stood at the corner of the store and saw the fight between Scott and Leo.
*7 After Leo hit Scott on the head with the rifle, Scott "came up" and started running, with his arms out, toward the corner of the store where Gloria stood. Leo stated that Scott "charged at" Gloria; Gloria testified that she did not see a weapon in Scott's outstretched hands as he ran toward her. Gloria testified that she closed her eyes and "drew up," thinking that Scott was going to attack her. She fired the pistol and shot Scott in the abdomen, below his navel.[8] After being shot, Scott ran past Gloria to the neighbor's house, where his car had been before he drove it to the store. An ambulance took Scott to a hospital.[9]
The following morning, Leo and Gloria went to the sheriff's department to give a written statement of the previous night's events. Scott also gave a written statement.
In April 1995 (a month before Scott sued the Browns), the Browns submitted a "claim of loss" to Acceptance. Mary Anderson, a "litigation manager" for Acceptance Insurance Company, testified that, at the time of the Browns' claim, "she understood that the date of loss was March 27, 1995, and that the allegations were that someone named Shaun Scott had been shot by the insured during an attempted break-in of the store." Acceptance's general agent, NAI Excess & Surplus Lines, had assigned the investigation of the claim to an independent adjuster, Capitol Adjustment Company, Inc. ("Capitol Adjustment"). When Anderson received notice of the claim, she says, she reviewed the insurance policy covering the Browns and determined that the policy had an "intentional-acts" exclusion and an assault-and-battery exclusion. According to Anderson, in light of the preliminary facts provided from the loss notice and the intentional-acts and assault-and-battery exclusions in the policy, she sent a "reservation-of-rights" letter to Leo Brown on April 14, 1995.[10]
*8 In the meantime, Willard Smith, an investigator for Capitol Adjustment, investigated the Browns' claim, on behalf of Acceptance. Smith interviewed Leo and Gloria Brown on April 10, 1995. Gloria stated that Scott came running at her "like a wild man" and that she did not aim the gun at him. She told him she did not know immediately that she had pulled the trigger: "I had [the gun] in my hand and I just drawed up and jumped out of his way[.] I never knew I had shot him until the law told me I had." On April 12, 1995, Smith forwarded to Acceptance transcribed versions of Leo and Gloria Brown's statements.
Smith also determined that the Perry County Sheriff's Department had investigated the beating and shooting of Scott and was treating the incident as a criminal offense of aggravated assault or assault in the first degree. Smith obtained the Perry County Sheriff's Department's report of the incident and, on April 17, 1995, forwarded the report to Acceptance. Acceptance asked Smith to continue his investigation, to clarify the incident.
On May 1, 1995, Smith took photographs of the G & L Grocery premises. At that time, he again spoke with Leo Brown, who told him that a grand jury had met and had indicted him and Gloria on charges of criminal assault. Leo Brown also told Smith that they had hired an attorney to defend them at an upcoming hearing.[11] On May 3, 1995, Smith reported this information to Acceptance.
On May 26, 1995, Scott sued the Browns, alleging that Leo and Gloria Brown had "negligently and/or wantonly injured him by shooting and beating him without provocation, justification and/or legitimate excuse."
On June 1, 1995, the Browns' attorney sent Vintson Insurance Agency a letter requesting that Acceptance defend the Browns in Scott's civil lawsuit and asking that Vintson forward the letter to Acceptance. The record indicates that Anderson received this letter from the Browns' attorney along with a copy of Scott's complaint. In a June 13, 1995, letter, Anderson advised the Browns that Acceptance disclaimed coverage of Scott's claims, based on the "bodily-injury" and "assault-and-battery" exclusions and on a "punitive-damages" exclusion (which we cannot find in the record).[12] *9 On November 9, 1995, the Browns' attorney wrote Anderson to challenge Acceptance's decision to deny the Browns' claim for a defense and indemnity in the Scott lawsuit. Specifically, the Browns' attorney argued that the three exclusions cited by Anderson did not apply, and he demanded that Acceptance provide a defense for the Browns under a reservation of rights.
Acceptance interpreted the letter from the Browns' attorney as a request that it reevaluate its position concerning whether it had a duty to defend the Browns. In response to the letter, Acceptance retained Coleman Meador, an attorney, for the purpose of obtaining a "coverage opinion." Meador's February 9, 1996, coverage opinion concluded that the arguments raised by the Browns' attorney were not valid and that Acceptance did not have a duty to defend or indemnify the Browns. On March 26, 1996, Anderson notified the Browns' attorney, by letter, that Acceptance had reconsidered its decision not to defend Leo and Gloria Brown in Scott's lawsuit, but had not changed its position.[13]
*10 On May 8, 1996, the Browns sued Acceptance and Scott,[14] seeking a judgment declaring that Acceptance was required to defend and indemnify them in the civil lawsuit filed on May 26, 1995, and styled Sha[u]n B. Scott v. Leo Brown and Gloria Brown, CV-95-53.
Scott's civil action was tried to a jury in early April 1997. The jury rendered a verdict for Scott. Based on the jury's verdict, the court entered a judgment for $30,000 in compensatory damages and $20,000 in punitive damages against Leo and Gloria Brown, jointly and severally. Following the entry of the judgment in Scott's lawsuit, the Browns amended their complaint in their lawsuit against Acceptance. The complaint, as amended, asserted that Acceptance had breached its insurance contract when it refused to defend and indemnify the Browns in Scott's action. The amended complaint also alleged that Acceptance had in bad faith breached its duties to defend and to indemnify the Browns. The Browns continued to seek a judgment declaring that Acceptance was required to defend and indemnify them, and they also sought compensatory and punitive damages.
On April 28, 1998, Acceptance moved for a summary judgment on all of the Browns' claims. On June 22, 1998, the trial court granted Acceptance's motion as to all of Leo Brown's claims; as to the claim that Acceptance was required to indemnify the Browns for punitive damages awarded in Scott's lawsuit; and as to the bad-faith claim insofar as it related to Acceptance's failure to indemnify the Browns. The trial court denied the summary-judgment motion as to Gloria Brown's breach-of-contract claim based on the failure to defend ("Count One"); Gloria Brown's breach-of-contract claim based on the failure to indemnify ("Count Two"); and Gloria Brown's bad-faith claim relating to the failure to defend ("Count Three").
Counts One through Three were tried to a jury on February 28, 2000. At trial, Gloria Brown presented testimony from two experts to the effect that Acceptance had failed to properly investigate the Browns' claim before it denied it on June 13, 1995. Specifically, Bibb Allen, an attorney specializing in insurance-coverage matters, offered an opinion that because an assault-and-battery exclusion was involved and the policy provided no definition of "assault and battery," industry practice required the insurer to seek a coverage opinion from an attorney before denying Gloria Brown a defense in the underlying civil action.
A former claims representative for a State Farm insurance company testified that Acceptance did not follow "accepted industry practices because [it] did not secure some legal opinion before [it] made a denial [decision.]" The record indicates that Acceptance offered no expert testimony at trial to rebut the testimony given by Allen and the former claims representative.
At the close of Gloria Brown's case, Acceptance moved for a directed verdict. The court denied Acceptance's motion as to the duty to defend and withheld a ruling on the duty to indemnify. Acceptance renewed its motion for a directed verdict at the close of all the evidence. The court denied that motion.
The jury returned a verdict for Gloria Brown on all three counts. On Count One, the duty-to-defend claim, the jury awarded $20,000 in compensatory damages. On *11 Count Two, the duty-to-indemnify claim, the jury awarded $50,000 in compensatory damages. On Count Three, the bad-faith claim, the jury awarded compensatory damages of $200,000 and punitive damages of $1.2 million. The trial court entered a judgment consistent with the verdict with one exception: the $20,000 award in connection with the "duty-to-defend" claim was eliminated based on a stipulation that any compensatory damages awarded as to that claim would be subsumed into the compensatory-damages award as to the bad-faith claim.
On March 15, 2000, Acceptance moved for a judgment as a matter of law ("JML"), or, in the alternative, a new trial. In support of its motion, Acceptance argued that, as to all three counts, the jury's verdict was not supported by legally sufficient evidence. On the alternative motion for a new trial, Acceptance argued that the trial court had erred in refusing to admit evidence indicating that Acceptance had obtained a coverage opinion from an attorney with respect to its denial of the Browns' claim.[15] Acceptance also argued that it was entitled to a remittitur of both compensatory and punitive damages. On June 12, 2000, the trial court entered an order denying Acceptance's motion for a judgment as a matter of law. The court denied Acceptance's motion for a new trial insofar as it related to the exclusion of evidence regarding the coverage opinion. The court granted Acceptance's motion for a remittitur and ordered as follows: (1) that compensatory damages on Count Two, the failure-to-indemnify claim, be reduced to $30,000; (2) that compensatory damages on Counts One and Three, the breach-of-contract and bad-faith claims for failure to defend, be reduced to a total of $75,000; and (3) that the punitive-damages award be reduced to $300,000. Gloria Brown accepted the remittitur.
On July 10, 2000, Acceptance appealed from the final judgment, and on July 24, 2000, Gloria Brown appealed from the trial court's June 12, 2000, order conditioning its denial of the motion for a new trial on the requirement that she accept a remittitur.
Acceptance argues that the trial court erred in (1) denying Acceptance's motion for a JML as to Brown's breach-of-contract and bad-faith claims; (2) denying its motion for a new trial on the ground that the trial court had improperly excluded evidence indicating that Acceptance had obtained a coverage opinion after it had denied the Browns' claim; and (3) failing to further reduce the jury's award of compensatory and punitive damages. As to Acceptance's appeal, Gloria Brown counters with the arguments that the trial court correctly excluded evidence regarding the coverage opinion Acceptance obtained after it had denied the claim, that Acceptance was not entitled to a JML, and that no further reductions of the damages awards are justified. On her cross-appeal, Gloria Brown argues that the trial court erred in ordering a remittitur of the compensatory- and punitive-damages awards.

II.
This Court has stated the standard for appellate review of a trial court's ruling on a motion for a JML:

*12 "The standard of review applicable to a ruling on a motion for [a JML] is identical to the standard used by the trial court in granting or denying [that motion]. Thus, in reviewing the trial court's ruling on the motion, we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.
"....
"... In ruling on a motion for a [JML], the trial court is called upon to determine whether the evidence was sufficient to submit a question of fact to the jury; for the court to determine that it was, there must have been `substantial evidence' before the jury to create a question of fact. `[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'"
American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1366-67 (Ala.1993). (Citations omitted.) See Ex parte Grand Manor, Inc., 778 So.2d 173 (Ala.2000). The denial of a motion for a new trial is within the sound discretion of the trial court. Williams v. Williams, 786 So.2d 477, 479 (Ala.2000) (citing Hill v. Cherry, 379 So.2d 590 (Ala.1980)).
"`The jury's verdict is presumed to be correct, and that presumption is strengthened by the trial court's denial of the motion for a new trial.'" Williams, supra, 786 So.2d at 480 (quoting Friendly Credit Union v. Campbell, 579 So.2d 1288, 1291 (Ala.1991)) (other citations omitted). Moreover, "[t]his Court will not reverse a judgment on a jury verdict on a weight-of-the-evidence basis unless the evidence, when viewed in a light most favorable to the nonmovant, shows that the verdict was plainly and palpably wrong and unjust." Id.
A. Duty to Indemnify
Acceptance argues that the trial court erred in holding that the evidence was legally sufficient for a reasonable jury to find that Acceptance had a duty to indemnify Gloria Brown. Specifically, it argues that coverage of Scott's claims against the Browns was precluded by the policy's "assault-and-battery exclusion," which, it says, covers more than just injuries resulting from an assault and battery. Rather, in support of its broad interpretation of the provision, Acceptance argues that the provision excludes injuries "arising out of" an assault or battery and injuries "arising out of ... any act or omission in connection with the prevention or suppression of such acts." Accordingly, Acceptance essentially argues, the exclusion bars recovery because Scott's injuries arose out of an assault or battery.
In general, the insurer bears the burden of proving the applicability of any policy exclusion. Fleming v. Alabama Farm Bureau Mut. Cas. Ins. Co., 293 Ala. 719, 310 So.2d 200, 202 (1975). In Singer Sewing Machine Co. v. Methvin, the Court described "assault and battery" as follows:
"`A successful assault becomes a battery. A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner.... The wrong here consists, not in the touching, so much as in the manner or spirit in which it is done.... Thus, to lay hands on another in a hostile manner is a battery....'"
184 Ala. 554, 561, 63 So. 997, 1000 (1913); see Surrency v. Harbison, 489 So.2d 1097, 1104 (Ala.1986) (quoting this language). "[W]hen there is conflicting evidence, ... the issue of whether there was, in fact, an *13 assault and battery at all is a question for the jury." Surrency, 489 So.2d at 1104 (citations omitted).
In this case, there was conflicting evidence as to whether Scott's injuries arose out of an assault or battery or were the result of negligent or wanton conduct on the part of Gloria Brown. According to Acceptance, the evidence at trial demonstrated that, on the night of March 27, 1995, there were as many as three assaults or batteries and that they invoked the assault-and-battery exclusion in the CGL policy. Specifically, Acceptance contends, Gloria's conduct amounted to an assault and battery of Scott because, it says, Gloria laid in wait for Scott with a loaded .32 caliber pistol and shot Scott in the abdomen. Further, Acceptance states that, according to Gloria's own testimony, Scott assaulted her when he ran at her with his arms outstretched. Finally, Acceptance contends that Leo assaulted and battered Scott when he fired warning shots at Scott and beat him on the head with a rifle.
However, the record also indicates that Gloria Brown presented evidence from which the jury could have found that Scott's shooting was "accidental" and not the result of an assault and battery. Specifically, Gloria testified that she did not intend to shoot Scott but that, in fact, it was only after she had telephoned law-enforcement officials that she realized Scott had been shot. Gloria told the jurors that she closed her eyes, that she drew up the pistol she was holding, and that, at that time, she did not know she had fired the pistol. She further testified that she knew Scott and would never have wished to hurt him. Therefore, Brown provided evidence suggesting that Scott's injuries were not the result of an assault or battery and did not arise out of an attempted suppression of an assault or battery. Rather, her evidence presented a fact question as to whether her shooting of Scott was accidental and, therefore, covered under the policy, or was, instead, the result of an assault and battery and, thus, excluded from coverage.
Acceptance cites this Court's decision in Gregory v. Western World Insurance Co., 481 So.2d 878 (Ala.1985), in which Western World had issued to the proprietors of Big Daddy's Lounge a liability-insurance policy that included an assault-and-battery exclusion substantially similar to the exclusion in this case. 481 So.2d at 878. When one of the lounge's patrons sued Big Daddy's and others for damages, based on an assault and battery by another patron, this Court held that Western World was not liable because the policy clause clearly excluded injuries arising out of an assault and battery. Id. at 881. Acceptance's reliance on Western World is misplaced. In Western World, the injured patron's complaint specifically alleged that one of the codefendants had "committed an assault and battery on [him]." Western World, 481 So.2d at 878. The complaint also alleged that agents of Big Daddy's Lounge had "negligently and wantonly maintained the premises" and that the patron's injuries were the proximate result of wanton or negligent conduct. Id. at 879. Unlike the complaint in Western World, Scott's complaint did not allege that Scott's injuries arose from an assault and battery; instead, he claimed damages arising from alleged negligence and wantonness on the part of the Browns.
Upon reviewing the record in this case and the evidence both parties presented at trial, we conclude that the trial court properly submitted the duty-to-indemnify claim to the jury. Accordingly, the court properly denied Acceptance's motion for a JML as to that claim.
*14 B. Duty to Defend
Acceptance asserts that the trial court erred in holding that the evidence was legally sufficient for a reasonable jury to find that Acceptance had a duty to defend Gloria Brown. Specifically, Acceptance argues that, based on the allegations in Scott's complaint and the facts revealed by Acceptance's investigation of Brown's claim, one would have to conclude that Scott's injuries arose out of an assault and battery or the prevention of an assault and battery. Accordingly, it concludes, under the express terms of the policy it had no duty to defend Gloria Brown.
It is well settled "that [an] insurer's duty to defend is more extensive than its duty to [indemnify]." United States Fid. & Guar. Co. v. Armstrong, 479 So.2d 1164, 1168 (Ala.1985) (citations omitted). Whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by the allegations contained in the complaint. Id. at 1168. If the allegations of the injured party's complaint show an accident or occurrence within the coverage of the policy, then the insurer is obligated to defend, regardless of the ultimate liability of the insured. Ladner & Co. v. Southern Guar. Ins. Co., 347 So.2d 100, 102 (Ala.1977) (citing Goldberg v. Lumber Mut. Cas. Ins. Co., 297 N.Y. 148, 77 N.E.2d 131 (1948)). However, "[t]his Court ... has rejected the argument that the insurer's obligation to defend must be determined solely from the facts alleged in the complaint in the action against the insured." Ladner, 347 So.2d at 103. In Pacific Indemnity Co. v. Run-A-Ford Co., 276 Ala. 311, 161 So.2d 789 (1964), this Court explained:
"We are of opinion that in deciding whether a complaint alleges such injury, the court is not limited to the bare allegations of the complaint in the action against insured but may also look to facts which may be proved by admissible evidence...."
276 Ala. at 318, 161 So.2d at 795; see Ladner, 347 So.2d at 103 (quoting this language). "[I]f there is any uncertainty as to whether the complaint alleges facts that would invoke the duty to defend, the insurer must investigate the facts surrounding the incident that gave rise to the complaint in order to determine whether it has a duty to defend the insured." Blackburn v. Fidelity & Deposit Co. of Maryland, 667 So.2d 661, 668 (Ala.1995) (citing United States Fid. & Guar. Co. v. Armstrong, 479 So.2d 1164 (Ala.1985)) (other citations omitted). When a complaint alleges both acts covered under the policy and acts not covered, the insurer is under a duty to at least defend the allegations covered by the policy. Blackburn, 667 So.2d at 670 (citing Tapscott v. Allstate Ins. Co., 526 So.2d 570, 574 (Ala.1988)).
Scott's complaint against Leo and Gloria Brown read, in pertinent part:
"5.... Defendants Leo Brown and Gloria Brown negligently and/or wantonly injured Plaintiff by shooting and beating him without provocation, justification and/or legitimate excuse. On the contrary, on said occasion, said Defendants negligently and/or wantonly breached duties owned [sic] Plaintiff to not shoot and beat him under circumstances where there was absolutely no legal justification, excuse, or defense in doing so.
"6. As a proximate result of Defendants' negligence and/or wantonness, Plaintiff was caused to be shot, beaten, [and] hospitalized...."
(Emphasis added.) The evidence indicates that although Scott's complaint alleged negligence and wantonness, it also alleged that Scott sustained "beating" and "shooting" injuries as a result of the Browns' *15 actions on the night of March 27, 1995. Further, the complaint alleges that the Browns took such action against Scott with "absolutely no legal justification, excuse, or defense in doing so." Therefore, the complaint, on its face, states allegations that potentially bring the Browns' claims within the coverage terms of the policy and also alleges facts bringing the claim within the policy's "intentional-acts" exclusion[16] and its "assault-and-battery" exclusion.[17]
Acceptance states that because it received Scott's complaint several months after the Browns had submitted a notice of loss, it had already investigated the incident. Even though, Acceptance says, "the injuries alleged in [the complaint] clearly arose out of an assault and battery," Acceptance says it nevertheless "treated the matter as if there were some uncertainty" as to coverage because it considered the results of its investigation into the incident. (Appellant's Brief at 10.) Acceptance argues that the results of its investigation "only confirmed" its conclusion that the allegations in the complaint arose out of an alleged assault and battery. Id. Therefore, Acceptance concludes, it had no duty to defend.
We disagree. The record indicates that, pursuant to its investigation into the incident, Acceptance discovered evidence indicating that the March 27, 1995, shooting may have been accidental and the result of negligent or wanton conduct. In particular, Gloria Brown told Willard Smith that, on the night of the shooting, Scott came running at her "like a wild man," and that she did not aim the gun at him. She stated that she did not know immediately that she had even pulled the trigger: "I had [the gun] in my hand and I just drawed up and jumped out of his way[.] I never knew I had shot him until the law told me I had." Acceptance concedes that it had access to this information before it denied the Browns' claims. Because Gloria's statements to Smith provide support for the contention that Scott's injuries arose out of negligent or wanton conduct on the part of Gloria Brown and, thus, that her claims were arguably within the policy's coverage, the trial court properly submitted to the jury the issue whether Acceptance breached its contract of insurance by refusing to defend her in Scott's action. See Blackburn v. Fidelity & Deposit Co. of Maryland, supra, 667 So.2d at 670; Tapscott v. Allstate Ins. Co., 526 So.2d 570, 574 (Ala.1988). Therefore, the court properly denied Acceptance's motion for a JML as to Gloria Brown's duty-to-defend claim.
C. Bad-Faith Claim
Acceptance argues that the trial court erred in holding that the evidence was legally sufficient for a reasonable jury to find in favor of Brown on her bad-faith claim. The jury determined that Acceptance had acted in bad faith in failing to provide Brown with a defense in Scott's civil action. Therefore, we will address Brown's bad-faith claim only as it pertains to the duty to defend, and not as it might pertain to the duty to indemnify.
A plaintiff has two methods by which to establish a bad-faith refusal to pay an insurance *16 claim: he or she can prove the requirements necessary to establish either an "ordinary" case or an "extraordinary" case. State Farm Fire & Cas. Co. v. Slade, 747 So.2d 293, 306 (Ala.1999); Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 976 (Ala.1998).
In an "ordinary" bad-faith claim, the plaintiff bears a heavy burden. LeFevre v. Westberry, 590 So.2d 154, 159 (Ala.1991) (citing National Sav. Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala. 1982)). To recover on such a claim, the plaintiff must prove: (1) the existence of an insurance contract; (2) an intentional refusal to pay the claim; and (3) the absence of any lawful basis for the refusal and the insurer's knowledge of that fact or the insurer's intentional failure to determine whether there is any lawful basis for its refusal. National Sec. Fire & Cas. Co. v. Bowen, 417 So.2d 179, 183 (Ala.1982); see Slade, 747 So.2d at 304 (reviewing the law of bad faith). "In short, [the] plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute." Bowen, 417 So.2d at 183. In such a case, the plaintiff's contract claim must be so strong that the plaintiff is entitled to a preverdict JML; if a fact issue makes a JML inappropriate, then the defendant is entitled to a JML on the plaintiff's bad-faith claim. National Sav. Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.1982).
However, "keenly aware of the fact that there were countervailing policy considerations that weighed in favor of an insured's right to have his claim properly evaluated and promptly paid by the insurer," this Court recognized "a different standard to be applied in certain unusual or extraordinary cases." Thomas v. Principal Fin. Group, 566 So.2d 735, 742-43 (Ala.1990). "The rule in [extraordinary] cases [of bad faith] dispensed with the predicate of a preverdict JML for the plaintiff on the contract claim if the insurer had recklessly or intentionally failed to properly investigate a claim or to subject the results of its investigation to a cognitive evaluation." Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 976 (Ala. 1998) (citing Blackburn v. Fidelity & Deposit Co. of Maryland, supra, and Thomas v. Principal Fin. Group, supra). In State Farm Fire & Casualty Co. v. Slade, 747 So.2d at 318, this Court held that, in order to recover under a theory of an "extraordinary" case of bad-faith failure to investigate an insurance claim, an insured must show (1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim. This Court also recognized in Slade that "extraordinary" cases have been limited to those instances in which the plaintiff produced substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim. 747 So.2d at 306-07.
In Slade, this Court recognized that contractual liability is a prerequisite for liability for bad faith. Therefore, one who cannot prove she was entitled to benefits under an insurance policy cannot recover on a bad-faith claim. See id. at 318 (noting that bad-faith liability is limited to those cases in which the insured is entitled to benefits under the policy). We have *17 already determined that substantial evidence supported the jury's determination that Acceptance breached its contract with Gloria Brown when it refused to defend her in Scott's action. We also find in the record substantial evidence to support the jury's finding that Acceptance refused in bad faith to defend Gloria Brown.
Apparently, Brown's bad-faith claim was tried to the jury as an "extraordinary" or "abnormal" bad-faith claim. See State Farm Fire & Cas. Co. v. Slade, supra. At trial, Brown argued that Acceptance failed to properly investigate her claim and to obtain a coverage opinion before denying her request for benefits. To support her allegations, she presented expert testimony to the effect that industry practice required that Acceptance obtain a coverage opinion from an attorney before denying Brown a defense. According to Brown, Acceptance's failure to obtain a coverage opinion until five months after it had initially denied her claim evidences bad faith on the part of Acceptance in refusing to subject her claim to a cognitive evaluation and review.
Acceptance argues that, even assuming that its refusal to defend Gloria Brown in Scott's action was tantamount to a breach of the insurance contract, it at least had a debatable reason for denying her request for a defense. Further, Acceptance argues that it conducted what it calls "a prompt and thorough investigation into the underlying facts." (Appellant's Brief at 15.) Specifically, Acceptance asserts that during his investigation into the claim Smith contacted local law-enforcement officials, interviewed the Browns, and traveled to the premises of G & L Grocery. It contends that the only evidence Brown presented in support of her bad-faith claim was expert testimony to the effect that the "industry standard" requires an insurer to obtain a coverage opinion before denying a claim for benefits. We disagree.
Brown presented sufficient evidence to support the jury's finding that Acceptance's refusal to provide her a defense was not "fairly debatable." In addition to expert testimony, Brown offered evidence showing that Acceptance denied her request for a defense even though it had information supporting Brown's contention that the shooting was accidental or, at least, may have been the result of negligence on the part of Brown. Further, Brown presented evidence indicating that Anderson's decision to deny her claim violated the company's own review policies. In deposition, Anderson affirmatively stated that "there's a greater duty to defend than to indemnify." According to Anderson, "[i]f there's any potential for coverage arising out of the allegations, then [Acceptance] would have at least a duty to defend ... under a Reservation of Rights." After hearing the evidence at trial, the jury could reasonably have found that Acceptance acted in bad faith in refusing to defend Gloria Brown. Therefore, the trial court properly denied Acceptance's JML motion as to Brown's bad-faith claim.

III.
Acceptance argues that it is entitled to a new trial because, it says, the trial court erred in prohibiting Acceptance from introducing into evidence the fact that Acceptance obtained a "coverage opinion." Acceptance asserts that, in direct response to the November 9, 1995, letter from the Browns' attorney, Anderson reopened the Browns' file and hired a lawyer, Coleman Meador, to evaluate and analyze the legal issues raised by the Browns. Meador concluded, in a February 19, 1996, coverage opinion, that the arguments raised by the Browns were without merit *18 and that Acceptance had correctly denied their claim. Acceptance contends the trial court's exclusion of this evidence was an abuse of discretion because, it says, Brown premised her bad-faith claim on her theory that Acceptance should have obtained a coverage opinion with respect to the Browns' claims. Acceptance essentially argues that, but for the trial court's exclusion of this evidence, the jury would not have found in favor of Brown on her bad-faith claim and, thus, would not have awarded punitive damages against Acceptance.
"The decision to admit or to exclude evidence is within the discretion of the trial judge, and [this Court] will not reverse such a decision absent an abuse of discretion." City of Birmingham v. Moore, 631 So.2d 972, 974 (Ala.1994) (citing Eason v. Comfort, 561 So.2d 1068, 1072 (Ala.1990)). Further, "the mere showing of error is not sufficient to warrant a reversal; it must appear that the appellant was prejudiced by that error." Id. at 973-74, citing Rule 45, Ala. R.App. P.; see also Industrial Risk Insurers v. Garlock Equip. Co., 576 So.2d 652, 658 (Ala.1991); Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991).
According to Brown, Meador's own statements during Mary Anderson's depositions demonstrated that he and Acceptance believed the letter was not a coverage opinion supporting Acceptance's decision but, rather, was a letter written to reassure Acceptance that the denial would be defensible at trial. Specifically, Brown contends that Acceptance began characterizing Meador's letter as a coverage opinion "only after [the Browns' expert] stated in his deposition that a first-year law student would have advised that Acceptance tender a defense." (Appellee's Brief at 41.) Further, Brown argues, Acceptance's characterization of the letter as a coverage opinion is undermined by the fact, she says, that Meador's letter was written several months after Acceptance had received the November 9, 1995, letter from the Browns' attorney.
We have already concluded that Brown presented sufficient evidence to create a fact question as to whether Acceptance acted in bad faith when it denied her request for a defense. In fact, Acceptance provided little or no evidence to refute her allegations that it either failed to subject the results of its investigation to a cognitive evaluation or review, or that it acted in contravention of industry standards when it failed to obtain a coverage opinion until five months after it had initially denied her claim. Therefore, even if the trial court had admitted into evidence information concerning the after-acquired coverage opinion, this evidence still would have been insufficient to rebut Brown's evidence that Acceptance failed to subject her claims to a cognitive analysis or review and that it denied her request for a defense even though it had information that arguably brought Brown's claims within the scope of the policy's coverage provisions and not within an exclusion. Therefore, Acceptance has failed to show both that the trial court abused its discretion in excluding this information from evidence and that, assuming there was error on the part of the trial court, the error was prejudicial. See City of Birmingham v. Moore, 631 So.2d 972, 974 (Ala.1994).

IV.
Acceptance, finally, asserts that the trial court did not sufficiently reduce the jury's award of compensatory and punitive damages. The jury had awarded Gloria Brown (1) $20,000 in compensatory damages as to the "duty-to-defend" claim, (2) $50,000 in compensatory damages as to the "duty-to-indemnify" *19 claim, (3) $200,000 in compensatory damages as to the bad-faith claim, and (4) $1.2 million in punitive damages as to the bad-faith claim. The trial court entered a judgment consistent with the verdict, except that the $20,000 award on the "duty-to-defend" claim was eliminated, based on a stipulation that any compensatory damages awarded on that claim would be subsumed into the compensatory-damages award regarding the bad-faith claim. On Acceptance's motion, the trial court ultimately reduced both the compensatory- and the punitive-damages awards. Acceptance now argues that the trial court failed to sufficiently reduce these awards.
A. Compensatory Damages
In its order regarding Acceptance's post-trial motion, the trial court reduced the compensatory-damages award on Count Two, Brown's duty-to-indemnify claim, to $30,000 because $20,000 of the judgment in Scott's action was punitive in nature. The trial court also reduced the compensatory-damages award as to Counts One and Three, Brown's duty-to-defend and bad-faith claims, to $75,000. Acceptance argues that the $30,000 compensatory-damages award on Brown's duty-to-indemnify claim should be reduced by half and that the compensatory-damages award as to the duty-to-defend and bad-faith claims is excessive and not supported by the record. Brown, on the other hand, acknowledges that the compensatory-damages award as to her "duty-to-indemnify" claim was properly reduced to $30,000, and she maintains that it should not be further reduced. Moreover, she asserts that under no circumstances is Acceptance entitled to a further reduction of the duty-to-defend and bad-faith compensatory-damages awards.
When reviewing a jury's compensatory-damages award, we examine the record to determine whether the award is supported by the evidence. See Estate of Henderson v. Henderson, 804 So.2d 191, 193 (Ala.2001) (noting that the evidence did not support the jury's compensatory-damages award as to widow's breach-of-contract claim).
1. Duty-to-Indemnify Award
Acceptance asserts that the compensatory award in Scott's action should be reduced from $30,000 to $15,000 because, it says, "Acceptance had no duty to indemnify Leo Brown for his beating of Shaun Scott." Acceptance devotes a single, short paragraph to this argument, citing no legal authority for its contention that the duty-to-indemnify award should be reduced by one-half.
The trial court noted in its order that because it had previously ruled that Acceptance had no duty to indemnify the Browns for punitive damages, the jury could have awarded no more than $30,000 on Brown's "duty-to-indemnify" claim. Because Leo and Gloria Brown were, and are, jointly and severally liable for the entire $30,000 award, the trial court reasoned, Acceptance had a duty to indemnify Gloria Brown for the full $30,000.
We reject Acceptance's argument that the compensatory-damages award should be reduced by one-half. "`Where an appellant fails to cite any authority, we may affirm, for it is neither our duty nor [our] function to perform all the legal research for an appellant.'" Henderson v. Alabama A & M Univ., 483 So.2d 392 (Ala.1986) (quoting Gibson v. Nix, 460 So.2d 1346, 1347 (Ala.Civ.App.1984)) (other citations omitted). We note, however, that the record indicates that Scott sued Gloria and Leo Brown as joint tortfeasors and that a single judgment was entered against Gloria and Leo Brown. Under Alabama law, Gloria Brown was individually obligated *20 to satisfy the entire judgment and could not successfully argue that she was obligated only to pay half of the judgment. Yancey v. Farmer, 472 So.2d 990, 992 (Ala. 1985); Buchanan v. Collier, 555 So.2d 134 (Ala.1989).
2. Duty-to-Defend and Bad-Faith Awards
Apparently, Brown's compensatory damages on Counts One and Three were composed of two elements: (1) legal expenses in defending Scott's civil action and (2) mental anguish. Acceptance argues that the $75,000 compensatory-damages award is excessive and not supported by the record. Specifically, it argues that Brown's legal expenses for her defense of Scott's civil action were no more than $2,875. Acceptance arrives at this figure because, it states, $10,500 of the $16,000 of Gloria Brown's claimed legal expenses were paid before Scott's complaint was served on the Browns and, therefore, went to defend her and her husband on the criminal-assault charges.[18] Brown, on the other hand, argues that although Acceptance elicited some possibly conflicting testimony from her, the jury nevertheless could reasonably find that she paid $16,000 in legal fees related to Scott's civil action.
With regard to the jury's award of the duty-to-defend and bad-faith compensatory damages, the trial court's order states, in pertinent part:
"The Court ruled prior to submission of the case to the jury that the compensatory damages under Count [One] will be subsumed into any compensatory damages awarded under Count [Three]. Accordingly, the Court finds that the total amount of compensatory damages awarded under Counts [One] and [Three] was $200,000. The compensatory damages in this case under Counts [One] and [Three] could only be made up of the costs the Plaintiff incurred for defending herself in the lawsuit brought by ... Scott and any mental anguish she suffered. The evidence is somewhat ambiguous regarding the amount of attorney's fees paid for the defense of Gloria Brown for the civil suit. The Defendant argues that the most the Browns could have paid was $4,750.00 based on the evidence presented through cross-examination of Gloria Brown. The Plaintiff argues that the evidence shows that she paid a total of $16,000 for defense of the Scott lawsuit. The actual testimony regarding that follows:
"`Q. And can you remember the expense of hiring an attorney to defend you? Do you know how much you paid your attorney who defended you in the lawsuit filed against you by ... Scott?
"`A. I paid Ted Hellums $15,000.00 and I paid you, Robert Turner, $1,000.00.'
"Thereafter, the cross-examination testimony was as follows:
"`Q. And you hired a lawyer to represent you in connection with that criminal trial?
"`A. Yes.
"`Q. And some of the fees that you paid to the lawyers were for representing you in the criminal proceeding?
"`A. Yes.
"`....
"`Q. You know you paid him money? Part of it was to represent you?
*21 "`A. It was all pending at the same time.
"`Q. But, all of the checks were written to represent you and Mr. Leo Brown not just you by yourself?
"`A. That's correct.
"`Q. All right. And part of the money went to defend you and Mr. Leo Brown in the criminal action and not the civil case?
"`A. Yes.
"`....
"`Q. The best evidence of what you paid to defend yourself in a civil lawsuit would be the checks you wrote to Mr. Hellums' law firm after you were served with a civil complaint and after you knew that the insurance company was not going to provide a defense for you, right?
"`A. Right.'
"The Plaintiff argues that Mrs. Brown's testimony shows that she paid $16,000.00 for the defense of the civil case and that the defense simply did not ask the right questions on cross-examination. However, the question that was asked of her on direct was not how much did you pay your attorney to defend you in the lawsuit but the question was `do you know how much you paid your attorney who defended you in the lawsuit filed against you by ... Scott'?
"The Court finds that the evidence supports a finding that $16,000.00 was not paid for Gloria Brown's defense of the civil lawsuit but was paid in defense of her and Leo Brown in both the civil [action] and the criminal action. As argued by the Defendant, the Plaintiff provided little evidence of mental anguish. Based on the evidence the Court finds that the [compensatory-damages] award under Counts [One] and [Three] should be remitted to $75,000.00."
(C.R. at 782-83.)
Our independent review of the record indicates that none of the figures used by the trial court, Acceptance, or Gloria Brown is supported by the record. The record indicates that the Browns paid a total of $18,631.40 in legal fees. (C.R. at 850-53.) The record further indicates that the Browns paid $10,250 of these total legal fees before the May 26, 1995, filing of Scott's complaint. (C.R. at 850.) After Scott had filed his complaint, Gloria or Leo wrote five additional checks relating to their defense of either the criminal action or the civil action; these checks were in the amounts of $300.25; $2,500; $3,000; $2,000; and $581.15. (C.R. at 851-52.) Although the record is unclear as to whether these payments were related to the Browns' defense in the criminal action or in the civil action,[19] it is clear that Gloria Brown paid, at most, $8381.40 for legal services relating to her defense of the civil lawsuit. Accordingly, Gloria Brown's assertion that her legal fees relating to her defense of the civil action amounted to $16,000 is not supported by the evidence, and the compensatory award is due to be further reduced.[20]
As the trial court noted in its order, the $75,000 compensatory-damages award also included damages for any mental anguish Gloria Brown had suffered. As the trial court also noted, however, Gloria Brown presented scarce evidence of her alleged mental anguish. In support of *22 her claim for mental-anguish damages, she testified:
"Q. And you thought you had insurance to defend you, didn't you?
"A. Yes, I did.
"Q. You bought the insurance to pay any judgment that was coming against you to a certain amount?
"A. Yes.
"Q. [In] fact the insurance company failed to defend you. Does that cause you any problems?
"A. Oh, sure it did.
"Q. Tell the ladies and gentlemen of the jury how it affected you.
"A. In a lot of ways, I had to give up my store, and I nearly went broke.
"....
"Q. Did the fact [Acceptance] didn't defend you, did it cause you to worry some?
"A. Oh, yes. It worries me yet."
(R.T. at 246-47.)
This Court has held: "There is no fixed standard for determining the amount of compensatory damages a jury may award for mental anguish. The amount of the damages award is left to the jury's sound discretion, subject only to review by the court for a clear abuse of that discretion." Delchamps, Inc. v. Bryant, 738 So.2d 824, 837 (Ala.1999). (Citations omitted.) We must address the strength of this presumption of correctness in light of Brown's failure to testify in significant detail about the nature of the mental anguish she alleges was caused by Acceptance's failure to defend her in Scott's civil action. See Delchamps, 738 So.2d at 837.
In Kmart v. Kyles, 723 So.2d at 578, this Court held that it "give[s] stricter scrutiny to an award of mental anguish [damages] where the victim has offered little or no direct evidence concerning the degree of suffering he or she has experienced." In Kmart, this Court reduced a compensatory-damages award of $100,000 to $15,000, where the plaintiff had failed to present the trial court any evidence as to her mental anguish. In doing so, this Court distinguished the facts of Kmart from those presented in Foster v. Life Ins. Co. of Georgia, 656 So.2d 333 (Ala.1994), wherein the plaintiff had at least testified to the issue of mental anguish by saying that the defendant's actions had affected her "a lot." In Foster, this Court stated:
"We recognize that mental anguish and emotional distress are not items for which a precise amount of damages can be assessed; thus, in considering whether a jury verdict for compensatory damages is excessive, we must view the evidence from the plaintiff's perspective and determine what the evidence supports in terms of the plaintiff's suffering. In this case, the only evidence regarding Foster's mental anguish and emotional distress is her bare assertion that the discovery of fraud affected her `a lot' and that she sued two months after the mental anguish and emotional distress began. From this limited evidence, we agree that the jury could infer that Foster suffered some measure of mental anguish and emotional distress from the realization that she had been paying over a fifth of her monthly income to an insurance company for a worthless policy; however, we hold that, even when viewed in a light most favorable to her, Foster's scant testimony of mental anguish and emotional distress, without more, does not support an award exceeding $120,000 for each of the two months before she sued. We conclude that the $250,000 compensatory damages award was excessive by $200,000."
656 So.2d at 337 (citation omitted).
Brown provided the trial court with little direct testimony about mental anguish. In *23 fact, in its remittitur order the court noted the paucity of evidence in support of her claim for mental-anguish damages. Accordingly, the absence of evidence to support Brown's claimed suffering, that is, evidence demonstrating quantifiable effects, whether from Brown, from other family members, or from a professional, leads us to conclude that the trial court should have further reduced the jury's award of $200,000 in compensatory damages on Counts One and Three. See Delchamps, 738 So.2d at 838 (analyzing Foster). We believe the greatest amount of mental-anguish damages the jury could have awarded Brown, based on the evidence, is $21,000.
Because the record indicates that Brown incurred approximately $9,000 in legal fees in defending herself in Scott's civil action, and because we find that the greatest amount of mental-anguish damages the jury could have awarded Brown is $21,000, we hold that the trial court should have reduced the compensatory-damages award on Counts One and Three from $200,000 to $30,000. If Brown does not accept such a remittitur of the compensatory-damages award as to Counts One and Three, Acceptance must be granted a new trial.
B. Punitive Damages
The jury's verdict awarded Brown $1.2 million in punitive damages, which the trial court reduced to $300,000. Acceptance first argues that the trial court should not have submitted the issue of punitive damages to the jury. According to Acceptance, Brown failed to produce any evidence indicating that Acceptance acted with malice, wilfulness, or a wanton or reckless disregard for the rights of others. However, Brown produced sufficient evidence for a jury to conclude that Acceptance's refusal to provide her with a defense, in light of its clear duty to do so, amounted to conduct of that nature. See Gulf Atlantic Life Ins. Co. v. Barnes, 405 So.2d 916, 925 (Ala.1981). Accordingly, the trial court properly submitted the question of punitive damages to the jury.
Next, Acceptance asserts that even following a remittitur to $300,000, the punitive damages awarded to Brown are excessive, in light of the guideposts set out in BMW of North America, Inc. v. Gore, 701 So.2d 507, 512 (Ala.1997). Brown, on the other hand, argues that the trial court should not have reduced the jury's award and that there is no rationale on which this Court could further reduce the punitive-damages award.
In its order, the trial court stated its reasons for ordering a remittitur of the punitive-damages award, as it is required to do by Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986). The trial court's order states, in pertinent part:
"As to punitive damages, the Court is required to consider a number of factors including: (1) the ratio of punitive damages to compensatory damages, (2) the reprehensibility of the Defendant's conduct, (3) similar civil and criminal sanctions, (4) the profitability of the Defendant's conduct, (5) the financial position of the Defendant, and (6) the cost of litigation. Based on the jury's award of compensatory damages, the jury's award of punitive damages did bear a reasonable relationship to the compensatory damages awarded by the jury. In light of this Court's order of remittitur of compensatory damages under Counts [One] and [Three], the Court finds that punitive damages in this case should be remitted to $300,000.00
"Regarding the reprehensibility the Court does not agree that the evidence shows that the policy was changed after *24 the claim. The Court does find that based on the Defendant's clear duty to defend, the failure of the Defendant to offer a defense and the evidence that showed that the Defendant had clearly deviated from accepted insurance industry practices, the evidence supports the punitive damage award discussed above by the Court.
"There was no evidence one way or the other of similar civil or criminal sanctions.
"As to the profitability of the Defendant's conduct, the Court finds that the [punitive-damages] award as discussed above is sufficient to remove any profit that may have been realized by the Defendant as a result of failure to provide a defense.
"There is no evidence that the award for punitive damages in this case would destroy the financial viability of the Defendant.
"As to costs of litigation, there was no evidence submitted other than the testimony at trial regarding the costs of litigation."
(C.R. at 784-85.)
Recently, in Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), the United States Supreme Court addressed the question whether an appellate court should review a trial court's punitive-damages award according to an abuse-of-discretion standard or according to a de novo standard. Reasoning that the guideposts established in Gore, supra, "will acquire more meaningful content through case-by-case application at the appellate level," the Court held "that courts of appeals should apply a de novo standard of review when passing on [a trial court's] determinations of the constitutionality of punitive damages awards." 532 U.S. at 436, 121 S.Ct. at 1685-86. Accordingly, in light of the United States Supreme Court's recent pronouncement, we review the trial court's punitive-damages award in this case de novo. In conducting our de novo review, this Court likewise considers the "guideposts" established in Gore I and the factors set out in Hammond and Green Oil that pertain to the question of excessiveness. Employees' Benefit Ass'n v. Grissett, supra, 732 So.2d at 978 (citing BMW of North America, Inc. v. Gore, 701 So.2d 507 (Ala.1997) (on remand from the United States Supreme Court) ("Gore II")). Our de novo review of the punitive-damages award in this case, made in light of Gore II, Hammond, and Green Oil, leads us to conclude that the trial court should have further reduced the jury's punitive-damages award. In light of the fact that Brown's total compensatory damages amount to no more than $60,000, we conclude that her punitive-damages award should amount to no more than $180,000. Therefore, we affirm the judgment on the condition that Brown file with this Court, within 21 days, a remittitur of compensatory and punitive damages to the total sum of $240,000. Otherwise, the trial court's judgment will be reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.[*]
*25 HOUSTON, LYONS, BROWN, JOHNSTONE, and STUART, JJ., concur.
HARWOOD, J., concurs in the result.
MOORE, C.J., and WOODALL, J., concur in part and dissent in part.
MOORE, Chief Justice (concurring in part and dissenting in part).
I dissent from that portion of the opinion and judgment requiring a further remittitur of the punitive-damages award, because I feel this Court must give more deference to the trial court and the jury. The jury thought the defendant's conduct was egregious enough for a punitive award of $1.2 million, and the trial judge, who was present during the trial, reduced that award to $300,000. I do not think the reduced award is overly punitive, and I do not know what standard this Court can apply to find that it is. I also question whether Cooper Industries, Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), mandates in Alabama appellate courts the application of a de novo standard for reviewing punitive-damages awards. Otherwise, I concur.
WOODALL, Justice (concurring in part and dissenting in part).
I dissent from the extent of the remittitur of compensatory and punitive damages. Otherwise, I concur.
NOTES
[1] At all times pertinent to the facts of this case, Leo and Gloria owned and operated G & L Grocery.
[2] The policy indicates that coverage was effective beginning March 10, 1995.
[3] The "Declarations Page" of the policy contains this wording:

"Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue: ... (AL2107 (3-93)) [the "assault-and-battery" exclusion]."
[4] The record indicates that the Browns heard from two people that their store would be burglarized that night. After R.G. and M.D. left the store, Gloria Brown received a telephone call from a person who made statements to the effect that the store would be burglarized by R.G. and M.D. When Leo was closing the store that evening, an acquaintance advised him that the store would be burglarized that night.
[5] It is undisputed that Scott had been to the store three or four times before, and the Browns admitted knowing Scott's name and being able to recognize his car.
[6] The record indicates that the lock on the door was not actually broken or damaged. Further, there was no damage to any of the windows in the store, and there was no damage to the burglar bars on the front door. The store lost no merchandise.
[7] Scott testified that, after he first heard gunfire, he looked up and recognized Leo and Gloria Brown. He further testified that he held his hands in the air and said, "Look, it's Shaun. Y'all don't have to shoot me. Y'all know me." He testified that Leo said he was there to "rob" the store, and that he responded, "No, sir. I just want some gas." He also admitted that, when he arrived at the store, he was intoxicated.
[8] The record before us contains no evidence indicating that Scott was armed with any weapon during this incident. Scott testified that he never ran toward the people shooting at him. Leo testified that he thought he heard Gloria fire three shots.
[9] Scott had surgery to repair the damage done by the gunshot. Apparently, the bullet exited the lower right side of his back. He stated that his injuries required internal stitches and stomach staples. He also stated that he received stitches for injuries sustained to the back of his head; he testified that he has a "knot" on the back of his head and a 4- to 6-inch long scar as a result of the incident. He also stated that the injuries he sustained to his face have caused continuing sinus problems.
[10] Anderson's letter to Leo Brown stated, in pertinent part:

"We have received a loss notice as a result of an incident occurring on or about March 27, 1995. Mr. Scott was allegedly shot during a break-in attempt at G & L Grocery located in Lawley, Alabama.
"We respectfully wish to call your attention to your Policy No. CP633893, Form CG0001, SECTION ICOVERAGES, COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, which states in part:
"`1. Insuring Agreement.
"`a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" o[r] "property damage" to which this insurance applies.'
"This insuring agreement is subject to several exclusions. COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions, which states in part:
"`This insurance does not apply to:
"`a. "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.'
"We also would like to refer you to Form AL2107, entitled ASSAULT AND BATTERY EXCLUSION, which states:
"`It is agreed that the insurance does not apply to Bodily Injury including death, and/Property Damage arising out of assault and/or battery or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of you, your employees, patrons or any other person.'
"The facts of this incidence are not yet clear. Since this matter represents questionable coverage, Acceptance ... will proceed to investigate under a full and complete reservation of all our rights and defenses. This reservation extends to all facts, known and unknown, as they may pertain to this claim. The Company further reserves the right to deny coverage and withdraw from any further participation into this matter altogether, should facts be developed that would indicate that we should do so.
"By naming the specific grounds for the possibility for no coverage or benefits, we do not waive any of our rights or any of the other provisions or conditions of the policy of insurance and specifically reserve all of our rights and remedies under this policy and under the statutes and common law."
[11] The record indicates that an assistant district attorney ultimately dropped the criminal charges against Gloria Brown and that Leo pleaded guilty to assault in the third degree and received a suspended sentence.
[12] Anderson's letter stated, in pertinent part:

"This letter will acknowledge receipt of the Summons and Complaint No. CV-95[-]053, filed in the Circuit Court of Perry County, Alabama, and styled Sha[u]n B. Scott v. Leo Brown and Gloria Brown. This lawsuit stems from an incident which occurred on or about March 27, 1995. As indicated in my letter dated April 14, 1995, Acceptance Insurance Company has been investigating this alleged shooting incident under a reservation of rights.
"....
"Reviewing the allegations set forth in the lawsuit styled Sha[u]n B. Scott v. Leo Brown and Gloria Brown, the plaintiff's damages arise out of an assault and battery. It is the position of Acceptance Insurance Company that [the `bodily-injury,' `assault-and-battery,' and `punitive-damages'] exclusions would apply with respect to the claim presented by Mr. Scott. Therefore, we must respectfully disclaim coverage and contend you are not entitled to benefits under this policy.
"By naming the specific grounds for disclaimer of coverage, we do not waive any of our rights or any of the other provisions or conditions of the policy of insurance and specifically reserve all of our rights and remedies under this policy and under the statutes and common law.
"We can take no further action in this matter. Our decision has been based on the facts that have been made available to us. If you have any additional knowledge or facts that are relevant to your claim, we would be happy to reevaluate our position. Should the allegations in the Complaint be amended, please notify us immediately so we may reevaluate them as related to coverage under your policy. In providing the opportunity for further evidence, this Company does not waive any of its rights or defenses under the policy."
[13] Anderson's letter read, in pertinent part:

"In response to your correspondence dated November 9, 1995, Acceptance Insurance Company has reevaluated its position concerning the duty to defend your client in the matter styled Sha[u]n B. Scott v. Leo Brown and Gloria Brown. After further review, it is the position of Acceptance Insurance Company the policy exclusionary language is clear and unambiguous with regard to the facts of this incident and the allegations set forth in the Complaint.
"The allegations and facts reveal the plaintiff was allegedly `shot and beaten' by one or more of the Browns, resulting in bodily injury. It is the position of Acceptance Insurance Company the Assault and Battery exclusion would apply to this matter. It is our position this exclusion is not ambiguous and that it does not conflict with other policy terms and provisions.
"Acceptance Insurance Company, therefore, must respectfully reject your client's demand for a defense and indemnification under this policy of insurance. Our decision has been made after a full investigation of the facts of this matter and a review of the allegations set forth in the Plaintiff's Complaint. If you have any additional knowledge or facts relevant to this claim, we will be happy to again reevaluate our position. Should the allegations in the Complaint be amended, please notify us immediately so that we may reevaluate them as related to coverage under our insured's policy. In providing the opportunity for further evidence to be presented, this Company does not waive any of its rights or defenses under the policy of insurance."
[14] It is unclear from the record why the Browns named Scott as a defendant in their action against Acceptance.
[15] Before trial, Brown made a motion in limine asking the trial court to "order, instruct, and direct [Acceptance] and [its] counsel not to refer, relate, argue or in any way seek to admit into evidence ... [a]ny testimony or documentation concerning actions taken by [Acceptance], or its agents, following the denial of [the Browns'] claim on June 13, 1995." The motion in limine referred specifically to a "coverage opinion" requested and prepared in February 1996after Acceptance had initially denied the Browns' claim. The trial court granted the motion in limine, and Acceptance never sought to introduce the letter into evidence at trial.
[16] "This insurance does not apply to:

"a. `Bodily injury' or `property damage' expected or intended from the standpoint of the insured. This exclusion does not apply to `bodily injury' resulting from the use of reasonable force to protect persons or property."
[17] "It is agreed that the insurance does not apply to Bodily Injury, including death, and/or Property Damage arising out of assault and/or battery or out of any act or omission in connection with the prevention or suppression of such acts, whether caused by or at the instigation or direction of you, your employees, patrons or any other person."
[18] Acceptance's brief on this point is confusing because it first states that "it is undisputed that $10,500 was paid before Scott's complaint was served on the Browns," but then, in support of that figure, cites copies of checks totaling $10,250 dated before the service of Scott's complaint. (Appellant's Brief at 24.) (Emphasis supplied.)
[19] The canceled checks do not indicate whether payment related to defense of the Browns in the civil action or in the criminal action.
[20] Our conclusion is bolstered by the fact that the trial court conceded as much when it stated that Brown's claimed $16,000 in legal fees was not supported by record evidence.
[*] Note from the reporter of decisions: On July 24, 2001, the Supreme Court issued a "certificate of judgment of affirmance" reading as follows:

"WHEREAS, in keeping with the former order and judgment of this Court entered on June 29, 2001, cross appellant/appellee, Gloria Brown, did on July 17, 2001, file in this Court an acceptance of remittitur to the total amount of $240,000.
"IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the circuit court be reduced to $240,000 and as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs.
(Footnote cont'd.)
"IT IS FURTHER ORDERED AND ADJUDGED that the appellant/cross appellee, Acceptance Insurance Company, pay the costs of appeal and the costs taxed against the defendant in the court below will stand as taxed."