851 So.2d 548 (2002)
GUARANTY PEST CONTROL, INC.
v.
James BUSH and Helen Bush.
2001293.
Court of Civil Appeals of Alabama.
June 28, 2002.
Opinion on Return to Remand December 30, 2002.
*550 Gregory D. Crosslin, Charles W. Reed, Jr., and Benjamin H. Farrow of Crosslin, Slaten & O'Connor, P.C., Montgomery, for appellant.
Anthony B. Johnson of Hellums & Johnson, L.L.C., Centreville, for appellees.
CRAWLEY, Judge.
James Bush and Helen Bush sued Guaranty Pest Control, Inc. ("Guaranty"), in the Bibb Circuit Court. Their three-count complaint sought an award of damages on claims of negligence, breach of contract, and fraud. The case was tried before a jury between April 30, 2001, and May 2, 2001. During that trial, Guaranty filed motions for a judgment as a matter of law ("JML") at the close of the Bushes' evidence and at the close of all the evidence; those motions were denied by the trial court. On May 2, 2001, the jury returned a verdict in favor of the Bushes, assessing compensatory damages of $69,020 and punitive damages of $79,166.66, and the trial court thereafter entered a judgment on that verdict.
On May 10, 2001, Guaranty renewed its motion for a JML, pursuant to Rule 50(b), Ala. R. Civ. P., and filed a motion for a new trial or for a remittitur, pursuant to Rule 59, Ala. R. Civ. P. In its Rule 59 motion, Guaranty specifically challenged the verdict on the grounds that the award of punitive damages was excessive under the principles set forth in § 6-11-20 et seq., Ala.Code 1975; BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989). The trial court referred the case to mediation, which proved unsuccessful, and then held a hearing on Guaranty's postjudgment motions. However, the trial court did not enter an order granting or denying those postjudgment *551 motions, and they were denied on August 8, 2001, 90 days after their filing, pursuant to Rule 59.1, Ala. R. Civ. P. Guaranty appealed from the denial of its postjudgment motions; the Alabama Supreme Court transferred the appeal to this court, pursuant to Ala.Code 1975, § 12-2-7(6).
On appeal, Guaranty, citing Hammond, supra, and Love v. Johnson, 775 So.2d 127 (Ala.2000), contends that the trial court erred in allowing its Rule 59 motion challenging the excessiveness of the trial court's punitive-damages award to be automatically denied under Rule 59.1 by the lapse of time. Guaranty argues that the trial court should have stated reasons why the punitive-damages award should or should not be disturbed.
We conclude that this case is procedurally indistinguishable from Love. In Love, the plaintiff brought a wrongful-death action against the defendant and prevailed on that claim at trial. The jury assessed the plaintiff's damages at $150,000, and a judgment was entered on that verdict; however, the trial court failed to rule on the defendant's subsequent motion for a remittitur. The Alabama Supreme Court held that the trial court erred in failing to rule on the motion:
"The defendant correctly argues that the trial judge erred in allowing the motion for a remittitur, a motion challenging the jury's award as excessive, to be denied without providing a statement of the reasons for denial. We remand this case for the trial court to enter an order stating the reasons supporting its denial of the motion for a remittitur. See Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986). In Hammond, this Court required that a trial court `reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on the grounds of excessiveness of the damages.' 493 So.2d at 1379; see also ALFA Mut. Ins. Co. v. Brewton, 554 So.2d 953 (Ala.1989). In Hammond, this Court stated the reason for the requirement:
"`[T]he trial judge is better positioned to decide whether the verdict is ... flawed [as excessive]. He has the advantage of observing all of the parties to the trialplaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. There are many facets of a trial that can never be captured in a record, so that the appellate courts are at a special disadvantage when they are called upon to review [a] trial [court's] action in this sensitive area....'
"493 So.2d at 1378-79.
"On remand, the trial court is directed to enter an order in compliance with Hammond, and to file a return with this Court within 56 days after the release of this opinion."
775 So.2d at 127-28. The Supreme Court, in so remanding, "express[ed] no view ... on the substantive issue whether the defendant was entitled to a remittitur," and cautioned that its remand "should not be construed by the trial court or the parties as any expression of [its] views on that issue." Id. at 128.
Love was decided by the Alabama Supreme Court in 2000, and we are bound by it. See Ala.Code 1975, § 12-3-16. As the Bushes note, the Alabama Supreme Court, since Love was decided, has altered the substantive standard of appellate review of awards of punitive damages so that no presumption of correctness attaches to such an award. See Acceptance Ins. Co. v. Brown, 832 So.2d 1 (Ala.2001). However, despite the Bushes' arguments to the contrary, we cannot conclude that Acceptance Insurance altered the procedural requirements *552 that apply to judicial consideration of excessiveness challenges to punitive-damages awards. Indeed, Acceptance Insurance itself made clear that the trial court in that case had "stated its reasons for ordering a remittitur of the punitive-damages award, as it [wa]s required to do by Green Oil ... and Hammond." 832 So.2d at 23 (emphasis added).
The Supreme Court in Love remanded the case before it, and we remand this cause to the trial court. The trial court is directed to enter an order in compliance with Hammond and to file a return with this court within 56 days after the release of this opinion. See Love, 775 So.2d at 128. When the trial court files its return in this court, Guaranty will have 14 days to file a supplemental brief to argue its positions, if it so chooses; the Bushes will then have 7 days in which to respond, and Guaranty will then have 7 days to file a reply brief. See Love, 775 So.2d at 128. However, as the Supreme Court did in Love, we do not reach the question whether the defendant was entitled to a remittitur, and our remand should not be interpreted as any expression of the views of this court on that substantive issue.
REMANDED WITH INSTRUCTIONS.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.

On Return from Remand.
CRAWLEY, Judge.
On June 28, 2002, this court directed the trial court to enter an order in compliance with Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and to file a return with this court. The trial court has complied with the mandate of this court by entering an order declining to remit the punitive-damages award in this case and specifying its reasons, and the parties have filed supplemental briefs in response to the trial court's ruling. We therefore turn to the other issues Guaranty raises on appeal, which include (1) whether the jury's verdict holding Guaranty liable on the Bushes' claims is sufficiently supported by the evidence; (2) whether the jury's compensatory-damages award is excessive; (3) whether the jury's punitive-damages award is sufficiently supported by the evidence; and (4) whether the jury's punitive-damages award is excessive.
The first of these issues, whether there was sufficient evidence to support liability on the Bushes' claims, was raised in the trial court via Guaranty's motions for a judgment as a matter of law ("JML") under subsections (a) and (b) of Rule 50, Ala. R. Civ. P. In reviewing the propriety of a trial court's judgment as to such motions, we are governed by the following principles:
"`The standard of review applicable to a ruling on a motion for [a JML] is identical to the standard used by the trial court in granting or denying [that] motion. Thus, in reviewing the trial court's ruling on the motion, we review the evidence in a light most favorable to the nonmovant, and we determine whether the party with the burden of proof has produced sufficient evidence to require a jury determination.
"`....
"`... In ruling on a motion for a [JML], the trial court is called upon to determine whether the evidence was sufficient to submit a question of fact to the jury; for the court to determine that it was, there must have been "substantial evidence" before the jury to create a question of fact. "Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved."'"
*553 Congress Life Ins. Co. v. Barstow, 799 So.2d 931, 936 (Ala.2001) (quoting American Nat'l Fire Ins. Co. v. Hughes, 624 So.2d 1362, 1366-67 (Ala.1993)).
Viewing the evidence in a light most favorable to the Bushes, we note the following pertinent facts. James Bush is a retired brick mason who owns, with his wife Helen, a home in Bibb County in which the two of them have lived since the late 1970s. The Bushes began construction work on the house in 1976 or 1977.
In April 1979, before the house was fully completed, a representative of Guaranty contacted the Bushes and offered to provide a termite treatment for the house for $200. On or about April 24, 1979, Helen Bush signed a contract form authorizing Guaranty to treat the Bushes' house for subterranean termites and agreeing to pay Guaranty $200 in four installments. That work order provided that a Guaranty representative would remove all trash and debris containing cellulose from the house's crawl area, would remove all visible termite tunnels, would drill the brick veneer foundation walls "every 16-24 inches" and treat them with "termite chemical" (i.e., termiticide), would inject termiticide around the outside perimeter of the house, and would "trench" the soil underneath piers and supports and treat that soil with termiticide. The contract further provided that Guaranty would "reinspect the property within one year of initial service," and stated that should reinfestation occur within that one-year period, Guaranty would "re-inspect and re-treat the [house] at no additional cost where an active infestation" was confirmed. Guaranty also agreed, for an additional yearly sum of $30, to reinspect the property and to extend its contract obligations on a year-to-year basis.
A representative of Guaranty then undertook to inspect the Bushes' property and to treat the property for subterranean termites; that representative reported no existing termite damage to, or termite infestations in or near, the Bushes' uncompleted house. On April 26, 1979, two days after his wife had signed the contract, James Bush signed a work-order form in which he acknowledged satisfactory completion of the treatment specified by Guaranty in the contract; he subsequently paid Guaranty for the work in the installments specified in the contract. Guaranty issued the Bushes a certificate, labeled "Bonded Guarantee," in which it agreed to provide general termite treatment and to inspect that work for a one-year period; to retreat termite reinfestations "[d]uring the life of the contract and extensions thereto"; and to renew the contract for the yearly payment of $30. At the time of Guaranty's work on the Bushes' house in 1979, all of the brick had been laid and the exterior of the house had been finished; only the upstairs portion of the house remained to be completed.
Over the course of the following 20 years, the Bushes paid Guaranty the amounts specified in the April 24, 1979, contract form and the April 30, 1979, "bonded guarantee" form to extend Guaranty's inspection and retreatment obligations. During that period, a representative of Guaranty made an annual inspection of the Bushes' house, and the Bushes paid Guaranty's bill each year for that service. However, in October 1998, the Bushes' daughter noticed that one of the beams near the basement fireplace had dropped at least one and a half inches. Upon being informed of the problem, James Bush dismantled some of the fireplace's hearth, the mantle, and the surrounding rock; he discovered an area of water damage and found termites in a wall near the house's carport.
*554 James Bush then initiated repairs to the house, including dismantling the house's brick chimney, and contacted his homeowner's insurer, which engaged Crawford & Company, an independent adjusting firm, to investigate the claim. A number of photographs taken by Crawford & Company personnel in November 1998 and admitted into evidence at trial show no visible roof damage to the Bushes' house, although termite damage is visible in the framing behind where the chimney had been located and on the corner of the Bushes' garage. James Bush also contacted Guaranty and reported that his house was infested with live termites, after which Guaranty sent an exterminator to retreat the house on two different occasions.
At trial, James Bush testified that he and his son-in-law had replaced an approximately 20-foot segment of the downstairs wall of the house and 15 feet of upstairs wall; he testified that he had worked for a year and a half, for between three and four hours per day, to restore the house. James Bush estimated that his out-of-pocket repair expenses had amounted to $12,500 and opined that the house, which he testified had been worth between $100,000 and $110,000 before the discovery of the termite damage, was worth closer to $80,000 or $90,000. Moreover, James Bush testified that the discovery of termites and the damage to his house had caused him to worry, that he had complained to a doctor about stress related to the termite damage, that he still worries that the house has termites, that the termite damage has caused him and his family aggravation, and that his family had not been able to celebrate Christmas in its normal fashion for two years after the termite damage was discovered. Helen Bush also testified to having suffered emotional distress over the termite infestation and the resulting damage.
Although James Bush testified that Guaranty had represented to him in 1979 that it had "treated" the house, the Bushes adduced evidence tending to cast doubt on the truth of that statement. An Alabama Department of Agriculture inspector, John Belcher, inspected the Bushes' house in February 1999. His report of that inspection indicated that he found termite damage adjacent to the carport and discovered that the damage around the fireplace had been repaired before his inspection. Belcher's report indicates that termite-treatment holes drilled in the brick veneer of the foundation did not penetrate the hollow block foundation in the area of the floating slab or the carport; the report also notes that the carport slab, the basement slab, and the foundation block beneath the storage room had not been drilled, and that the patio slab did not appear to have been drilled.
In his deposition (the pertinent portion of which was disclosed to the jury), Belcher testified that Guaranty, in 1979, should have drilled in the areas he identified in his report unless the consumer (i.e., the Bushes) waived the minimum applicable standards, and that failing to drill in those areas would have cause the treatment not to have met applicable state regulations governing termite treatment. Moreover, Belcher testified that a qualified technician trained and knowledgeable about the state rules and regulations would have noticed the absence of any drilling.
The Bushes claimed in their complaint that Guaranty had breached a contract under which it was to treat and inspect their house; that Guaranty had negligently failed to treat and inspect the Bushes' house; and that Guaranty had negligently, wantonly, or recklessly misrepresented material facts regarding its treatment and inspection of the Bushes' house. The trial *555 court instructed the jury on principles of contract and negligence liability, as well as liability for reckless misrepresentations; the jury returned a verdict finding Guaranty liable to the Bushes on each theory, and Guaranty's Rule 59, Ala. R. Civ. P., motion for a new trial was denied by operation of law because the trial court did not rule on the motion within 90 days of its filing.
Although Guaranty contends that there was not substantial evidence presented to support the Bushes' negligence and breach-of-contract claims, our review of the record, in view of the attendant presumptions in favor of the verdict, convinces us otherwise. With respect to the breach-of-contract claim, the jury could have determined from the evidence that the Bushes entered into a contract with Guaranty pursuant to which the Bushes would pay $200 and Guaranty would undertake a duty to treat the Bushes' house, including drilling the brick veneer foundation walls and treating them with termiticide. Although there is no dispute that the Bushes paid Guaranty, Belcher's report and testimony supports the propositions that Guaranty, in 1979, did not drill far enough into the brick veneer to create a chemical barrier in all subterranean voids below the Bushes' house and thereby did not comply with pertinent state regulations regarding termite treatment. Moreover, there was evidence from which the jury could have properly inferred that Guaranty should have discovered its omissions in its annual inspections, and that the Bushes' house ultimately suffered damage from subterranean termites, i.e., the very condition that the Bushes had contracted with Guaranty to prevent.
Guaranty also challenges the sufficiency of the evidence to support the finding of liability for reckless misrepresentation. Although the record reveals that the trial court was hesitant to deny Guaranty's motion for a JML as to misrepresentation and to instruct the jury on that theory, it ultimately concluded that there was substantial evidence to support the Bushes' claim. The Guaranty contract form signed by Helen Bush on April 24, 1979, indicated that Guaranty's work order was attached "[f]or your assurance of professional and quality workmanship," and the work order includes a specification for drilling the brick veneer foundation every 16 to 24 inches and for treating those places with termite chemicals. Moreover, the "guaranteed contract" issued by Guaranty on April 30, 1979, recited that the Bushes had agreed to pay Guaranty $200 "[i]n consideration of GUARANTY['s] ... thoroughly spraying and treating underneath" their house. As discussed above, however, Belcher's testimony directly impeached the "thoroughness" of Guaranty's treatment in 1979, and James Bush testified that in reliance upon the representation that the house had been thoroughly treated, he had renewed his Guaranty termite bond each year for 20 years and did not hire another company to perform termite inspections or to treat any infestation during that period. Guaranty detected no infestation. From that evidence, the jury could properly conclude, as it did, that the Bushes relied on misrepresentations made by Guaranty regarding its treatment and inspections and that the subsequent termite damage necessarily flowed from the Bushes' detrimental reliance. We therefore affirm the trial court's denial of Guaranty's JML motions to the extent that they attacked the legal sufficiency of the evidence to support the Bushes' claims.
With respect to the second issue identified above, i.e., whether the jury's award of $69,020 in compensatory damages is excessive, we note that Guaranty failed to raise that issue in either of its postjudgment *556 motions; its trial counsel (which was not its appellate counsel) challenged only the award of punitive damages as excessive. We therefore agree with the Bushes that that issue has not been preserved for appellate review, and we pretermit consideration of that issue on the authority of ConAgra, Inc. v. Turner, 776 So.2d 792 (Ala.2000). In ConAgra, our Supreme Court held that a party challenging a compensatory-damages award as excessive must specifically raise that issue in the trial court:
"First, ConAgra contends that the jury's award of $50,000 in compensatory damages is excessive. However, because ConAgra failed to challenge the excessiveness of the compensatory-damages award specifically as a ground for a new trial, this issue is procedurally barred. State v. Ferguson, 269 Ala. 44, 45, 110 So.2d 280 (1959) (`The question of the excessiveness of the jury's verdict will not be considered or determined on appeal unless such question is first presented to the lower court which is usually done by a motion for a new trial. The motion must specifically challenge or question the amount of the verdict as being excessive.' (Emphasis added.)) See also § 12-22-71, Ala.Code 1975, Peete v. Blackwell, 504 So.2d 222 (Ala. 1986), and Feazell v. Campbell, 358 So.2d 1017 (Ala.1978)."
776 So.2d at 794.
We next consider Guaranty's arguments concerning the sufficiency of the evidence with respect to the jury's award of punitive damages. While "there is no such thing as a claim of punitive damages" under Alabama law, "there are claims on which our law authorizes the trier of fact to impose punitive damages if certain wrongfulness is proved by a sufficient weight of the evidence." Haynes v. Alfa Fin. Corp., 730 So.2d 178, 181 (Ala.1999). In this case, the Bushes sought an award of punitive damages on their reckless-misrepresentation claim, i.e., the claim that the trial court was most reluctant to submit to the jury. Ultimately, the trial court decided to submit the reckless-misrepresentation claim to the jury, over Guaranty's objection.
The trial court indicated that it would give instruction number 11.03 of the Alabama Pattern Jury Instructions: Civil, which is based upon § 6-11-20, Ala.Code 1975, and noted that that pattern instruction called for a trial court to "read only those portions of the charge on which evidence is submitted." In giving that instruction, the trial court informed the jury that for the Bushes to recover punitive damages, they must prove by "clear and convincing evidence that [Guaranty] consciously or deliberately engaged in fraud." The trial court also stated that "fraud means an intentional misrepresentation of a material fact the concealing party had a duty to disclose which was committed with the intention on the part of the defendant [of] thereby depriving a person or entity of property or legal rights or otherwise causing injury" (emphasis added). Although Guaranty objected to the punitive-damages instruction, the Bushes did not. The jury-verdict form directed the jury to circle either "yes" or "no" depending on whether it decided to award punitive damages on that claim. After deliberating, the jury returned a verdict in favor of the Bushes on the "punitive-damages" aspect of the reckless-misrepresentation claim and awarded punitive damages of $79,166.66. The trial court denied postjudgment relief as to that award, and on remand from this court entered an order concluding that the punitive-damages award was not excessive.
In enacting § 6-11-20, the Legislature determined that punitive damages "may not be awarded in any civil action" (except *557 wrongful-death actions) unless "it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Ala.Code 1975, § 6-11-20(a). The Legislature defined "clear and convincing evidence" as "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion." Section 6-11-20(b)(4). The Legislature also stated that "[p]roof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt." Id. Finally, the Legislature defined "fraud" as "[a]n intentional misrepresentation ... of a material fact the concealing party had a duty to disclose, which was gross, oppressive, or malicious and committed with the intention on the part of the defendant of thereby depriving a person or entity of property or legal rights or otherwise causing injury." Ala.Code 1975, § 6-11-20(b)(1) (emphasis added).
Although § 6-11-20(a) permits an award of punitive damages where a defendant has consciously or deliberately engage in "oppression," "wantonness," or "malice" toward a plaintiff, the Bushes were content to have the jury charged only on "fraud." Because, under Alabama law, unchallenged jury instructions become the law of the case, see Louisville & Nashville R.R. v. Atkins, 435 So.2d 1275 (Ala.1983), we will review only the sufficiency of the evidence in this case, in light of the standard adopted by the Legislature in § 6-11-20, Ala.Code 1975, to award punitive damages on the fraud theory on which the jury was instructed.
As we have discussed above, the Bushes presented evidence tending to show that Guaranty had represented to the Bushes, in its contract and bond forms, that it had treated the Bushes' house and that it had done so "thoroughly." The Bushes also presented evidence indicating that an examination of the property in 1999 indicated that Guaranty had not drilled, or drilled sufficiently, into several foundation areas beneath the Bushes' house. However, the termite bond also recognized that termite infestation might occur in the future despite "thorough" treatment, and provided for reinspection and retreatment of the residence in that event. Guaranty adduced evidence that its file regarding the Bushes' house indicated that it had treated the Bushes' house with the appropriate amount of termiticide in 1979 for that type of house, and its manager testified that before 1998 the Bushes had made no complaints of termite damage.
Under the portions of § 6-11-20 incorporated into the trial court's jury instructions, the Bushes were under a duty to adduce evidence supporting each element of their reckless misrepresentation claim, evidence "that, when weighed against evidence in opposition," would produce "a firm conviction" that Guaranty "consciously or deliberately engaged" in an intentional misrepresentation of a material fact "with the intention ... of thereby depriving a person or entity of property or legal rights or otherwise causing injury" so as to give rise to a "high probability as to the correctness of the conclusion." After a review of the evidence adduced by the parties, we cannot conclude that the Bushes met the heightened burden imposed by the Legislature for the imposition of punitive damages. Although we have already concluded that there is substantial evidence of a material misrepresentation upon which the Bushes reasonably relied and of damage *558 that could ultimately have resulted from that reliance, so as to support a finding of liability, there was not clear and convincing evidence that Guaranty, in making misrepresentations that it had "thoroughly" treated and inspected the Bushes' property, had any intent to deprive the Bushes of their property or legal rights or to otherwise cause them injury. See Thompson v. United Cos. Lending Corp., 699 So.2d 169, 176 (Ala.Civ.App. 1997) (reversing a directed verdict as to a fraud claim stemming from a lender's representations of "full" insurance coverage but affirming as to the punitive-damages issue, and noting the different standards of proof).
We therefore conclude that the Bushes' evidence was insufficient under § 6-11-20 to warrant an award of punitive damages.[1] That portion of the trial court's judgment entered on the jury's verdict awarding punitive damages to the Bushes is reversed, and the cause is remanded to the trial court for that court to vacate the punitive-damages award. In all other respects, the trial court's judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON and PITTMAN, JJ., concur.
YATES, P.J., concurs in the result.
NOTES
[1] Guaranty's argument that the award of punitive damages is excessive is therefore pretermitted.