# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 21, 2010 Session

## PAUL LEONARD v. LEO'S EXTERMINATING SERVICES, INC.

**Appeal from the Chancery Court for Sullivan County**
**No. 17-574-L      E. G. Moody, Chancellor**

**No. E2009-01398-COA-R3-CV - FILED MAY 27, 2010**

In May 1997, Paul Leonard ("the Homeowner") discovered termites in his home.  On June 11, 1997, he contracted with Leo's Exterminating Services, Inc., to treat his home.  Leo's performed the initial treatment.  The contract provided for annual renewals at a reduced rate.  The Homeowner renewed twice.  The last renewal was on June 11, 1999, which renewal qualified the Homeowner to receive, free of additional charge,  retreatment[1] for a "live infestation" until June 11, 2000.  Unfortunately, the initial treatment did not eliminate the termites.  The Homeowner reported a recurrence of termites several times between 1997 and 1999. Leo's made additional treatments. In 1998, Leo's assisted the homeowner with repairs to a sagging hallway over the area of infestation.  In 1999, the Homeowner switched to another exterminator who installed a "bait" system to control the termites.  On July 24, 2000, the Homeowner filed this action against Leo's in which he alleged that his home had been damaged as a result of deficient treatment by Leo's.   He alleged a breach of contract and violation of the Tennessee Consumer Protection Act ("the TCPA"), Tenn. Code Ann. § 47-18-101 et seq. (2001).  In the bench trial that ensued, Leo's challenged almost every aspect of the Homeowner's case including the causal connection between the deficiencies and the damage.  Leo's also raised the defense that the contract limited the Homeowner's remedy to retreatment only, and that the statute of limitations had expired on the TCPA claim.  In its opinion and order, entered as the final judgment, the trial court found that Leo's had failed to control the termites and that its failure amounted to a breach of the contract; that the Homeowner sustained damages of $39,910.87 as a result of the breach; and that Leo's was guilty of willful deception in violation of the TCPA, justifying trebled damages of $119,732.61.  The trial court also awarded the Homeowner his resonable attorney's fees of $30,000.  Leo's appeals.  We affirm that part of the judgment awarding damages of

---

[1]Normally, we would hyphenate the word "retreatment" to distinguish its root word, "retreat," from what soldiers are forced to do when overcome by the enemy.  However, based on our reading of the cases, and the usage in this case, it appears that the usage in the pest control industry is to spell it as one word without the hyphen.  We have followed that practice in this opinion.

$39,910.87 for breach of the contract. We reverse that part of the judgment awarding treble damages and attorney's fees under the TCPA because we find that the TCPA claim is barred by the statute of limitations.

**Tenn. R. App. P 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Gary L. Edwards and Christie Hayes, Johnson City, Tennessee, for the appellant, Leo's Exterminating Services, Inc.

John P. Chiles, Kingsport, Tennessee, for the appellee, Paul Leonard

**OPINION**

I.

The Homeowner lives in a house he had built in 1968. When the house was built it was treated for termites with a product that is now obsolete and banned from use but is generally considered to be effective against termites for at least a decade and possible multiple decades. The first indication of a termite problem was in May 1997, when the Homeowner saw a "swarm" of termites in the basement.

The configuration of the house is important to an understanding of this appeal. The house is rectangular in shape with a full basement. The long part of the house runs parallel to the street, with the front of the house facing the street. The front, back, and left side of the basement, as you face the house, are below grade. A two-car garage makes up about half of the basement and opens to the right as one faces the house. To the left of the garage is the finished part of the basement which takes up the other half of the basement area. The basement floor is a concrete slab. The stairs from the top floor start at the back of the house and descend, toward the front of the house, into the basement. The stairs traverse approximately one-half the width of the home. The stairs end at a doorway in the basement at the bottom of the stairs ("the basement doorway"). The framing for the basement doorway is a short wall that makes contact at its top with a long wooden 6 inch X 10 inch beam ("the center beam"). The center beam runs the full length of the house near the mid-point of the width of the house. The center beam, in turn, supports the floor joists for the main floor. The top floor has a hallway that runs with, and directly above, the center beam. The

refrigerator for the kitchen in the top floor is plumbed for an automatic ice-maker and sits near the hallway, in fairly close proximity to the basement doorway, just slightly to the side of the center beam.

The significance of the basement doorway is that, by all accounts, the framing around the doorway is the main point of entry of the termites. Specifically, one of the framing members of the basement doorway extends below the slab where it makes what is referred to in the industry as "wood to ground contact." Wood to ground contact is a danger point for termite control because termites are wood-destroying insects that are cryptobiotic, which means they avoid exposing themselves to the open air[2]. The typical colony lives beneath the surface of the ground. They need food, moisture and shelter to survive. Wood is the termite's food. The ground supplies the moisture and shelter. Obviously, when the food source comes into contact with the shelter and moisture, the creatures are invited to eat. When they travel above ground, they build shelter tunnels out of their own feces and the most convenient building material available–which is usually mud. In this case there is no dispute that the tunnels built by the termites in the Homeowner's basement were built with mud.

The significance of the center beam is that it is the focal point of the structural damage to the house. It supports the floor and walls along the middle of the top level of the house. Approximately 25 feet of the forty-plus foot beam is now weakened by termite damage and needs to be replaced. The Homeowner testified that when he first discovered the termites in 1997–prior to Leo's involvement– approximately three feet of the center beam showed active termite damage when prodded with a screwdriver. The initial damage to the center beam was immediately above the framing of the basement doorway.

The significance of the hallway is that, as a result of termite damage to the structural supports, the hallway was found in May 1998 to be sagging approximately ½ inch below the walls. The Homeowner asked Leo's to help him with the repairs and Leo's agreed. The Homeowner removed the top layer of flooring, and took responsibility for replacing the top level of flooring and Leo's took over the work from there. When Leo's removed the particle board substrate in the hallway, it found a layer of moisture barrier. According to the Homeowner, there was a minute amount of moisture present that the Homeowner attributed to condensation. According to Randy Rinick, who is an employee of Leo's, the flooring was "sopping wet" with moisture. By all accounts, however, the bottom of the plywood subflooring situated below the moisture barrier was dry. An inspection of the center beam at the time of the repairs in 1998 revealed serious termite damage to the center beam spanning 15 feet of its length compared to three feet of length back in 1997. According to

---

[2]A limited exception is the "swarmer," the reproductive member of the colony, which does expose itself.

the Homeowner, the inspection included removing additional flooring to confirm that the damage did not go beyond the 15 feet. By the time the Homeowner finally eliminated the termites in 1999, they had damaged an additional 10 feet of the center beam over the finished area of the basement.

Leo's attempted at trial to blame the termite damage on a possible "aerial" swarm and the moisture in the hallway. The only explanation for the moisture that Leo's allegedly found was the refrigerator situated in the kitchen near the hallway. The Homeowner admitted that, on one occasion in 1996, the plastic supply line that carried water to the refrigerator's icemaker developed a leak. The Homeowner described the leak as a "pinhole" and testified that he had it repaired as soon as it was discovered. It only leaked a small amount of water onto the linoleum surface in front of the refrigerator. The Homeowner testified that, when he had the leak repaired, he also placed the base of the refrigerator in a protective metal pan to protect the house and floor from future leaks. The Homeowner's expert testified that he later tested the area for moisture and found insufficient moisture to support a colony of termites. He also testified that if the damage had been done by a hypothetical aerial swarm, the tunnels would have been made from something other than mud. He testified that all the tunnels in this case included mud as a construction material.

The initial treatment provided by Leo's focused on creating a "chemical barrier" around the perimeter of the house that would prevent termites from passing. A gap in the barrier as small as 1/16 inch can leave a pathway for termites. The barrier is achieved by injecting chemical around the outside of the foundation walls at specified spacing, and injecting chemical on the inside of the foundation wall through holes in the floor. Because the basement floor is a slab, this meant drilling the slab on a specific spacing pattern and injecting sufficient chemical below the slab to permeate the ground. Also, problem areas such as wood to ground contact points and voids require specific application.

Tennessee is known as a "label state" which means that pest control operators are regulated and the regulations require that the pesticides be applied according to label directions supplied with the product. Specifically, Tenn. Comp. R. & Regs. ch. 0080-6-14-.08(2)(a) states: "All applications of pesticides for the purpose of controlling wood destroying organisms shall be done in accordance with label directions . . . ." Other administrative regulations that impact this case include a requirement that any such contract be in writing with no open blanks, and a requirement that a "graph shall be drawn and attached to each contract . . . and said graph shall show the condition of the property as it relates to termite infestation and damage at the time of the initial contract." *Id.* at 0080-6-14-.08 (1)(a) & (c). Also, by regulation, "[a]ll contracts for termite control shall carry a one year warranty for retreatments of termites only. The issuance of a damage guarantee is optional." *Id.* at 0080-6-14-.08 (5).

As we have previously noted, the contract for initial treatment in this case was executed June 11, 2007. It identifies the problem insect as "subterranean termite." It describes the period of "coverage" to be one year from the initial treatment to include "any further retreatment necessary, where live infestation(s) are noted, free of charge for the term of this contract." The Homeowner was given the right to renew annually, up to five years, for an additional annual charge. The contract contained the following hand-written "Provision": "Retreat Only Guaranty." As we have indicated, the Homeowner renewed in June 1998 and June 1999.

To the contract was attached a graph bearing the legend, "Mark X at areas of damage." The graph reflects damage along a portion of the center beam. The person who prepared the graph for Leo's, Mr. Jackie Riley, testified that he had no independent recollection but that the graph reflected approximately 12 feet of possible damage. Riley admitted on cross-examination that, if the Homeowner testified that there was only 3 feet involved, he, Riley, could not dispute the Homeowner's testimony. The graph, according to Riley, specified "that they would do wood injections in that area." Riley was unwilling to admit that the graph was part of the contract or a treatment plan, but did admit that the technician who does the field work and applies the chemicals is expected to follow the graph unless a reason is given and the departure is cleared with management. Ultimately, however, the treatment must comply with the product label.

At the same time he completed the graph, Riley also completed a quality assurance report that went into Leo's file for this customer. One item Riley marked positive in the quality assurance form was "wood to ground contact." He marked that item because there "was actual wood that was going through the concrete touching dirt." The wood was "a support beam in the basement area" located towards the center of the basement. Riley could not recall the specific location of the touching support member, or whether the Homeowner had pointed out the wood member to him, but admitted that the Homeowner had interacted with him when he prepared the graph and contract. Even though the quality assurance document noted wood to ground contact, the graph did not specify treatment for wood to ground contact.

The technician who did the initial treatment, Mr. Chris Eads, had long since left Leo's employment but was found by Leo's on the eve of trial and called as a witness over the Homeowner's objection. Eads admitted that he had no independent recollection of what he did on this house, but stated that he would have followed the graph or the product label. He read the graph as indicating wood to ground contact and stated that he would, by his standard practice, have "rodded" the soil around the wooden member, injecting the chemical directly into exposed soil. We feel obligated to point out that Mr. Eads' testimony is contradicted by

the fact that the troublesome framing member was encased in concrete and not subject to "rodding" as Eads described it.

Eads further testified that he would not have intentionally or knowingly rendered deficient treatment or misled the Homeowner concerning the treatment. Eads admitted on cross-examination that, if he did not follow the graph or the label directions on the day he treated the house, he would have known that he was not providing an adequate treatment.

The termites the Homeowner saw in May 1997 appeared to be coming out of the ground in the vicinity of the framing for the basement doorway. The Homeowner contacted two exterminating companies and preferred Leo's. Jackie Riley is the employee Leo's sent to inspect the house. The Homeowner took Riley into the basement and showed him that the termites were coming from around the basement doorway. Riley's inspection included prodding the center beam with a tool to explore weakened wood. According to the Homeowner's testimony, there was only three feet of damage to the center beam. Mr. Riley offered two methods of treatment for control of the termites. One option was a bait system and the other was a chemical barrier system. The bait system was more expensive, and, according to the Homeowner, Riley told him the chemical barrier was tried and proven. Also, according to the Homeowner, Riley told him the chemical barrier treatment would kill the termites. The Homeowner chose the chemical barrier treatment. Riley proceeded to prepare the graph. According to the Homeowner, Riley gave him a copy of the contract and the graph at the same time. Riley also explained the graph, and what it meant with regard to the treatment to be performed. The Homeowner testified that he believed the graph was part of the contract.

According to the Homeowner, while the treatment was performed by Eads, Riley also showed up and later came back to check on Ead's work. This "concerned" the Homeowner because Riley indicated that Eads was inexperienced. Although the Homeowner did not trail Eads step-by-step, he did observe Eads' work. Specifically, the Homeowner noticed that Eads did not carry any chemicals into the finished part of the basement. Also, the Homeowner noticed there was no smell in some areas of the basement that was characteristic of the chemicals used on the job.

All the retreatments were documented in Leo's file and were addressed in the Homeowner's testimony. On July 29, 1997, the Homeowner reported "termites around den door." The den door is in close proximity to the basement doorway. Leo's performed a retreatment on August 8, 1997. On September 2, 1997, the Homeowner reported flying termites in the garage area in the vicinity of the stairs. The Homeowner testified that he voiced concern to Leo's about the ongoing problems. According to the Homeowner, Leo's told him not to worry. On April 29, 1998, the Homeowner reported termite swarms all over

the garage area. He testified that he showed Leo's that the termites were still coming from the same place, at the bottom of the basement doorway. The retreatment was performed just a few days later, on May 4, 1998. Leo's removed some of the wall covering during the May 4, 1998, retreatment to expose mud pathways built by termites along the framing of the basement doorway as well as a hole in the wood at the bottom of the framing. According to the Homeowner, he knew at this time there was wood to ground contact and knew from personal experience that this was a problem.

By May 1998, the hallway in the upstairs that runs above and parallel with the center beam had become soft and had sunken away from the walls. The Homeowner had undertaken some repairs of his own by placing some posts under the ceiling to hold up sagging floor joists. The Homeowner approached Leo's about repairing the damage to his home. The Homeowner vehemently denied asking for "help" but testified that he asked Mr. Rinick "to talk to his owner and see what they were going to do about my damage." Leo's agreed to limited repairs. When the flooring and subflooring for the hallway were removed, serious damage to the center beam was apparent. Portions of the ten inch center beam were eaten down to three inches in height. According to the homeowner, an additional 12 feet of the center beam had been damaged.

On May 17, 1999, approximately a year after the repairs were made, the Homeowner again reported termites "all over [the] basement." The Homeowner testified that he showed Leo's the termites were still coming from the same place. According to the Homeowner, he switched providers at this time because Leo's "never told me what they were going to do about my problem, how they were going to take care of it." The new exterminator installed a bait system. This ended the termite problems.

Sometime after he switched providers, the Homeowner took a closer look around the basement and found numerous differences between the treatment provided and the graph. The left wall and the back wall of the finished area of the basement had no drill holes. The front wall of the finished area of the basement was lined with some drill holes, but the drill holes were not capped, *i.e.*, covered, as called for in the graph, and there was no odor from this area at the time of the initial treatment. The garage area of the basement had drill holes that were not capped. The Homeowner testified that the misrepresentations and deceit alleged in his complaint all related to the failure of Leo's initial treatment to fully conform with the graph.

The Homeowner's expert, Mr. Cam Lay, testified that the problem was not with the retreatments but with the failure of the initial treatment to form a complete barrier. The actual, or focal, point of entry of termites into the structure was through the framing for the basement doorway. However, according to the expert, the termites could only reach that

focal point because of the lack of a complete perimeter barrier. Termite treatment of some areas without a complete perimeter barrier is somewhat like locking one door and leaving all the others open.

The Homeowner's expert identified numerous deficiencies in the initial treatment, including a failure to use the correct volume of chemicals. A house this size, according to the expert, required 291 gallons of mixed chemical but Leo's, used only 165 gallons. Also, good practice would have required special attention to the vicinity of the doorway which had been identified as the point of origin. This, in turn, would have required treatment to cracks and voids in the floor in that area, treatments that Leo's did not provide. Also, Leo's failed to inject chemicals directly into the wood framing of the doorway. The Homeowner's expert confirmed that he found gaps in the drill pattern in the basement as described by the Homeowner. These were deficiencies under both the graph and the product label. As to the areas which were drilled but not capped, the expert stated his opinion that they were not injected with chemicals. He based this opinion partially on the insufficient volume recorded and partially on the odor of the chemicals. According to the expert, the odor would have been noticeably strong if chemicals had been injected into uncapped drill holes.

The expert also stated the treatment rendered by Leo's was an incomplete treatment. Industry standards and regulations require that any consumer given less than a complete treatment be informed that they are receiving less than a complete treatment. All the treatment records in Leo's file indicate that the treatments were completed. The expert testified than any reputable pest control company would have known the treatment rendered was incomplete and deficient. Therefore, according to Lay, the failure to disclose the deficiencies and missing elements of the treatment amounted to deception. The expert also testified that the continued swarms of termites were indicators of a failure in the barrier and ongoing damage.

Leo's also called an expert, Mr. Jim Wright. Wright acknowledged that there were deficiencies in the initial treatment, but tried to explain them away. For example, he theorized that less than the required amount of chemicals were used because the ground under the slab would not accept the chemical. However, on cross-examination he admitted that there is a void between the slab and the ground which would accept chemical. Wright also testified that there is no such thing as a complete barrier. According to him, there will always be gaps in the barrier. This testimony was contradicted by practically all the other testimony in the case, including the testimony of Leo's employees. Since the focal area was identified and treated, at least according to Wright, the gaps in the barrier were insignificant. Wright admitted on cross-examination that as a state inspector he had issued citations to exterminators for the deficiencies of which Leo's was accused.

Wright blamed the termite damage on the moisture found between the layers of flooring in the vicinity of the center beam. It was his theory that termites entered though the basement doorway, and were trapped in the center beam by the initial treatment but continued to thrive on the wood and the moisture. According to Lay, he confirmed by testing and observation that the moisture level was slight at best, and this amount of moisture was readily explained by the termites themselves. Other than the leak in the refrigerator ice-maker line, which was cured in 1996 according to the Homeowner, there was no source of moisture identified at trial.

The trial court found the Homeowner's account more believable than Leo's. The court did not believe the trapped colony theory for two reasons. Other than the water leak in the ice-maker back in 1996, there was no moisture source identified. Also, the court found that the shelter tubes were constructed of mud. The trial court found that the initial treatment and the retreatments were deficient in several aspects. The court found that Leo's failed to provide a complete barrier and that the same failure was the cause of additional damage to the house as evidenced by the sagging floor and the progression of damage to the center beam. The court found that Leo's was deceptive as to almost every deficiency it identified. The court rejected Leo's argument that the "retreatment only" guarantee precluded damages because "cases from other jurisdictions hold that if the initial treatment is not properly performed, the contract does not limit the liability to retreatment only. *Guaranty Pest Control, Inc. v. Bush*, 851 So. 2d 548 (Ala. App. 2002) *Baird v. Dodson Exterminating Co.,* 217 Va. 745 (1977)." The court specifically held that the TCPA applies to termite contracts and further held that Leo's deceptive acts were willful and knowing because the technician who performed the initial treatment had to have known what he was not doing. The trial court found that an equitable way to determine damage was to compare the amount of center beam that was damaged before Leo's treated the house (3 feet) with the amount of center beam ultimately damaged (25 feet) and apportion damages by this ratio. Finally, the trial court found that this was an appropriate case, pursuant to the TCPA, for treble damages and for an award of attorney's fees in the amount of $30,000. Leo's filed a timely notice of appeal on June 29, 2009, from the judgment entered on May 29, 2009.

II.

Leo's identifies only two issues on appeal which it has stated so broadly as to presume the trial court committed errors and then ask us to determine whether the errors are reversible. We have restated the issues slightly to begin on a level field:

Whether the trial court erred in awarding judgment in favor of the Homeowner on his breach of contract claim.

Whether the trial court erred in awarding judgment in favor of the Homeowner on his TCPA claim.

III.

Leo's approach in this appeal is to talk only about the facts and law that are favorable to its position. Of course, that is not how an appeal works. Our standard for reviewing the decision of a trial court sitting without a jury requires us to conduct a *de novo* review of the record but presume the findings of fact are correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); ***Cross v. City of Memphis***, 20 S.W.3d 642, 644-45 (Tenn. 2000). We recognize that the trial judge is in a better position than this court to assess the credibility of witnesses and we give great weight to a trial court's determination of credibility. ***Randolph v. Randolph***, 937 S.W.2d 815, 819 (Tenn. 1996). Conclusions of law are reviewed *de novo* with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993).

IV.

A.

In support of its position that the trial court erred in holding it liable for breach of contract, Leo's attacks the trial court's conclusion that "the graph is a part of the contract and, that if it is not a part of the contract, that it is a contract in its own right." Before we address the specifics of Leo's argument, we note that even if the trial court was in error in this particular finding, the error would be harmless. We do not reverse a judgment because of an error made in the trial court unless that error "more probably than not affected the judgment." Tenn. R. App. P. 36(b). The testimony at trial was that the graph illustrated the treatment that Leo's expected to be provided by its technician and that the treatment illustrated on the graph and explained to the Homeowner would have been consistent with label directions had it been performed. The trouble is not that the graph illustrated substandard treatment, or that the graph somehow outlined treatment above and beyond label requirements. The problem is that, by the overwhelming weight of the evidence, the treatment rendered did not even get in the "ballpark" of the treatment outlined or the label requirements. There was independent proof, also, of what the label required and there is overwhelming proof that the treatment did not conform to the product label. There was uncontradicted proof that an exterminator who renders incomplete treatment must explain any missing elements to the customer, and uncontradicted proof that Leo's did not identify missing elements of its treatment to the Homeowner. Even though Leo's witnesses quarreled

-10-

with whether a treating technician is bound by the graph versus the label directions, they admitted that any departure from the graph was to be cleared with Leo's management. The true import of the testimony at trial is that the graph is Leo's interpretation of what the label required in this particular case. Thus, regardless of whether the graph was part of the contract, there was proof that the contract was breached by the treatment that did not conform to the label.

Turning directly to the arguments made, Leo's argues that because the regulations applicable to exterminators state that "[a] graph shall be drawn and attached to each contract," the graph cannot be part of the contract. *See* Tenn. Comp. R. & Regs. ch. 0080-6-14-.08(1)(c). We find the argument unpersuasive under the facts of this case for two reasons. The graph in this case went far beyond the scope of describing the condition of the property and the location of termite damage, which is all the referenced regulation requires. As we have already stated, the graph covered all aspects of the treatment and the technician was expected to follow the graph. It was Leo's choice to prepare a document that went beyond the requirements of the regulation and attach it to the contract. Thus, Leo's can take no comfort from the mere fact that the graph contained, in addition to a treatment plan, information that the regulation requires to be "attached" to the contract.

Additionally, even if what is mandatorily "attached" to a contract is not normally part of the contract, we believe the proof in this case supports the trial court's conclusion that the graph was part of the contract. The Homeowner interacted with Mr. Riley, the Leo's employee who prepared the graph, while it was being prepared. It was given to the Homeowner at the same time he was given his copy of the contract. The Homeowner testified that he believed the graph was part of the contract. The law recognizes that a contract may be made up of more than one document and the physical attachment of one paper to another, depending on the circumstances, can establish a connection between multiple documents sufficient to support the conclusion that they are part of one contract. ***Springfield Tobacco Redryers Corp. v. City of Springfield***, 293 S.W. 2d 189, 197 (Tenn. Ct. App. 1956). The circumstances under which the graph was prepared and tendered to the Homeowner suggest that, until litigation broke out, both sides of this dispute intended that the graph be considered part of the contract. To illustrate our point, we expect that if this action were, hypothetically, based upon the theory that something beyond the graph should have been done, Leo's would have been the first to insist that the graph was the part of the contract that reflected the full scope of the work to be done. Accordingly, we find no error in the trial court's conclusion that the graph was part of the contract. We do not reach the issue of whether the trial court's alternative conclusion, that the graph was a separate contract, was correct.

Next, Leo's argues that the breach, even if there was one, was not a material breach.

One of the arguments raised on this point is that since the graph was not part of the contract, failure to follow the graph was not material. We have already rejected the argument that the graph was not part of the contract. We need not revisit it just because it is used as a stepping stone to another argument. Another equally unconvincing argument that Leo's makes is that the contract does not obligate it to rid the house of termites, therefore the failure to do that cannot amount to a breach. Leo's was not held liable for the failure to rid the home of termites, per se. Leo's was held liable for not rendering the treatment required by the contract – treatment that, under the proof of this case, would more probably than not have eliminated the termites. The other arguments that Leo's makes in support of its contention that the Homeowner did not establish a material breach[3], *i.e.,* that the Homeowner did not prove causation and that the Homeowner did not establish that additional damage was done after Leo's treated the house, are without merit. We will deal with the substance of those arguments in order.

Leo's makes two passing arguments in support of its position that the required causal link between the deficiencies and the alleged damage is missing. First, Leo's argues that none of the areas that it did not treat were the point of entry of the termites into the home. It is true that even the Homeowner's expert agreed that the one point of entry of the termites was through the framing of the basement doorway. However, there are two problems with Leo's argument. First, the Homeowner's expert testified that Leo's did not treat the area at the bottom of the basement doorway in the manner it should have been treated. Second, the expert, Lay, added that the mode of operation of the chemical barrier system was to keep the termites from reaching that focal point or to kill them if they tried to travel from that focal point outside the perimeter of the house. Borrowing on the example we used earlier in setting forth the facts, the focal point is like an interior door that Leo's contracted to "lock" that, according to Lay, did not get locked. Moreover, Leo's also contracted to "lock" the exterior doors, via the chemical barrier, but did not do that either. Thus, there is no merit to Leo's point of entry argument.

Next, Leo's argues that the "retreatment only" guarantee means that even if there were damages, Leo's is not responsible for anything other than the cost of retreatment. Both parties agreed at oral argument that this is an issue of first impression in Tennessee. Leo's argues that "[c]ourts throughout the United States have consistently upheld retreatment-only contracts, and have held that exterminating companies are not liable for repair damages under retreat-only contracts under either contract or tort."

In truth, the cases on the subject go both ways. Some courts uphold "retreatment only" provisions. *See* ***Orkin Exterminating Co. v. Clark***, 253 So.2d 884, 884 (Fla. 3d DCA

---

[3]Leo's repeats almost all of its arguments in some form or another in almost all sections of its brief.

1971)(enforcing a contractual "limitation of liability" in the amount of $5000 as liquidated damages); ***Harmon v. Orkin Exterminating Co.***, 794 F.Supp. 589, 590 (W.D. Va. 1992)(summary judgment granted where customer had choice of 4 warranties and chose retreatment only); ***Smith v. Orkin Exterminating Co.***, 791 F.Supp. 1137, 1144 (S.D. Miss. 1990)("Orkin permissibly limited its liability for breach of its services contract to reinspection and retreatment."); ***Palmer v. Orkin Exterminating Co.***, 871 F.Supp. 912, 913-14 (S.D. Miss. 1994)(even if Orkin failed to treat in accordance with regulations and breached the contract, the limitation in the contract absolves it of responsibility for the damage); ***Johnson v. Orkin Exterminating Co.***, 746 F.Supp. 627, 632 (E.D. La. 1990) (treating the contractual limitation as having force of law between the parties to the contract).

Some courts do not enforce "retreatment only" provisions.[4]  *See **Baird v. Dodson Brothers Exterminating Co.***, 232 S.E.2d 770, 773 (Va. 1977)(where contract limited liability to inspection and retreatment except for damages caused by neglect, court refused to allow the limitation to "defeat the purpose of the contract"); ***Guaranty Pest Control, Inc. v. Bush***, 851 So. 2d 548, 555 (Ala. Civ. App. 2002)(jury could have found that the failure to drill and treat foundation per state regulations and failure to detect and correct in resinspections subjected the exterminator to liability); ***Adams v. Orkin Exterminating Co.***, 763 S.W.2d 318, 319 (Mo. Ct. App. 1988)(contractual limitation to "[r]etreatment" only would not be enforced where "dummy holes" supported finding that the exterminator did not even do the initial treatment, and the plaintiff alleged, also, that the exterminator failed to meet their retreatment obligations).

The Homeowner purports to synthesize the cases as all following the rule that "if the termite company does everything it is contractually obligated to do, and the termite problem continues, . . . damages may be limited by the terms of the contract; however, if the termite company does not do everything it contracted to do or violates state regulations, it is a tort and any contractual limitation on damages does not apply." We do not agree completely with the Homeowner's analysis.  For example, in ***Palmer***, 871 F.Supp. at 913-14, the retreatment only provision defeated liability even though there was testimony that treatment did not meet state regulations.  The Homeowner's argument is tantamount to saying that the only time the limitation will work is if there is no material breach of the contract.

Most, if not all, of the cases that enforce the contractual limitation on damages are void of meaningful discussion as to the equity or wisdom of enforcing such limitations.  They

_____

[4]The Homeowner concedes that the only case in Tennessee that has addressed a termite treatment dispute is ***Fuller v. Orkin Exterminating Co.***, 545 S.W.2d 103 (Tenn. Ct. App. 1975).  The Homeowner further concedes that ***Fuller*** is "factually inapposite" to the present case because, unlike in ***Fuller,*** there is no contention in the present case that the "retreatment only" limitation is ambiguous.

simply enforce the provisions because they are present. While there are seemingly more cases that enforce the limitation than refuse to enforce the limitation, we believe the cases that refuse to allow the limitation to defeat the purpose of the contract are better reasoned. We do not believe that a party that flagrantly ignores its obligations under a contract can then hide behind the terms of the contract when damage occurs. The law in Tennessee has long been that the first party to breach a material provision in a contract loses the right to insist upon full performance by the other. *See **Cummins v. McCoy***, 125 S.W.2d 509, 514-15 (Tenn. Ct. App. 1939); ***Carter v. Krueger***, 916 S.W.2d 932, 936 (Tenn. Ct. App. 1995). We agree with the reasoning of ***Baird*** and ***Adams*** that a "retreatment only" clause in a termite contract should not be used to defeat any and all obligations of an exterminator to preform an initial treatment and to perform competent inspections and retreatments. We need not go any further to dispose of this present case.

The trial court found that Leo's did not even drill numerous of the areas it was obligated to drill by the graph and the product label. This finding is not even subject to serious debate as even Leo's expert admitted that some of the areas had not been drilled. The trial court found that some of the holes were not capped and in turn found that uncapped holes went untreated. Again, the uncapped holes were clearly present and there was abundant evidence that the uncapped drill holes were not treated with the odorous chemicals. Further, the trial court found that Leo's fell short of its obligations when it failed to discover and correct the deficiencies when it retreated. Although the Homeowner's expert, Mr. Lay, expressed no criticism of the retreatments, he did testify that Leo's had to have known that the initial treatment was incomplete. It stands to reason that since Leo's was called back within weeks of the initial treatment to a house that was not even drilled properly and did not even have chemicals sprayed into many of the holes that were drilled, the retreatments were woefully deficient. The trial court's underlying factual findings are not against the preponderance of the evidence and are based on sound legal reasoning that we approve.

Leo's final argument against the breach of contract recovery is that the Homeowner did not prove that its damages were new damages sustained after and as a result of Leo's treatment. Leo's argues that there is undisputed proof that damage existed when Leo's arrived on the scene and that it is "rank speculation" to say that "additional termite damage (as well as the extent of any such damage) occurred after Leo's treatment." This argument has absolutely no merit. The Homeowner testified that when he first discovered his termite problem, it was inspected twice and he was present when the center beam was probed on both of those occasion. Damage was visible only in three feet of the beam directly above the basement doorway. The only evidence that even arguable refutes the Homeowner's testimony is the indeterminate "x" marks on the graph that is not to scale. The Leo's employee who drew the graph had no independent recollection of how much of the beam was damaged and admitted that he could not refute the Homeowner's testimony. By 1998, the

hallway upstairs above the center beam had sagged below the bottom of the walls and the damage to the beam spanned approximately 15 feet of its length. This is undisputed. By the time the termites were brought under control by another exterminator another 10 feet of the center beam was damaged. The trial court specifically found that the damage spread as a result of Leo's deficient treatment. The evidence does not preponderate against the trial court's findings as to damages the Homeowner sustained as a result of Leo's failure to render a complete treatment to the house.

As we have indicated, Leo's intersperses numerous brief arguments regarding the breach of contract claim throughout its main points. Some of these arguments appear to be "thrown in" for fear of missing something. Nevertheless, we have done our best to give each argument the attention it deserves, and we find all arguments against that part of the judgment awarding damages for breach of contract to be without merit. Accordingly, we will affirm that part of the judgment.

B.

We move now to Leo's objections to that part of the judgment that held it liable for a violation of the TCPA. As we have previously noted in our introductory paragraph, we find the TCPA claim to be barred by the applicable statute of limitations. We do not reach the other arguments made with respect to the TCPA claim.[5]

The trial court did not make an explicit finding with regard to the statute of limitations. Therefore, we conduct our own inquiry to determine where the preponderance of the evidence lies. *Kesterson v. Varner*, 172 S.W.3d 556, 566 (Tenn. Ct. App. 2005). The statute of limitations applicable to TCPA claims is codified at Tenn. Code Ann. § 47-18-110 (Supp. 2009), and the operative language is as follows: "Any action commenced pursuant to [the TCPA] shall be brought within one (1) year from a person's discovery of the unlawful act or practice . . . ." The inclusion of the word "discovery" incorporates the discovery rule into the TCPA as this court explained in *Schmank v. Sonic Automotive, Inc.*, No. E2007-01857-COA-R3-CV, 2008 WL 2078076 (Tenn. Ct. App. E.S., filed May 16, 2008):

Thus, the Tennessee legislature has determined that a plaintiff's

---

[5]Most of the arguments are repetitions of the arguments we have already considered, such as that the damages are specualtive and the damages were not caused by Leo's. The argument that the Homeowner did not prove willful conduct is a product of Leo's technique of ignoring the bad facts and stressing the good ones. The one exception is the argument that a termite damage claim does not fit under the rubric of the TCPA. Since we see no obvious reason why this argument is correct, we assume the complaint states a claim under the TCPA without deciding whether or not it does.

-15-

TCPA claim accrues at time of the "discovery of the unlawful act or practice," thereby making applicable the "discovery rule" first applied over thirty years ago in *Teeters v. Currey*, 518 S.W.2d 512 (Tenn.1974). *Id.*; *Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn.Ct.App.2000). The Supreme Court recently restated the discovery rule as follows:

It is now well-established that, where applicable, the discovery rule is an equitable exception that tolls the running of the statute of limitations until the plaintiff knows, *or in the exercise of reasonable care and diligence, should know that an injury has been sustained.* **Quality Auto Parts Co. Inc.**, 876 S.W.2d [818,] at 820 [Tenn.1994]. The discovery rule does not, however, toll the statute of limitations until the plaintiff *actually* knows that he or she has a cause of action. *The plaintiff is deemed to have discovered the right of action when the plaintiff becomes aware of facts sufficient to put a reasonable person on notice that he or she has suffered an injury as a result of the defendant's wrongful conduct.* **Shadrick v. Coker**, 963 S.W.2d 726, 733 (Tenn. 1998); **Roe v. Jefferson**, 875 S.W.2d 653, 657 (Tenn. 1994).

*Id.* at *2 (footnote omitted; emphasis in original).

This action was filed on July 24, 2000. The termite problems in this case were all related by the Homeowner and the Homeowner's expert to deficiencies in the initial treatment. The Homeowner testified that he switched providers because, even after Leo's came to his home in response to his May 17, 1999, telephone report of continuing swarms of termites, Leo's "never told me what they were going to do about my problem, how they were going to take care of it." By that time, the Homeowner had experienced years of continuing problems and damage that he blamed on Leo's initial treatment, or lack of it. He had even convinced Leo's in May 1998 to perform repairs on his home. We believe that by May 1998, when the Homeowner convinced Leo's to repair the sagging hallway and saw an additional 12 feet of the center beam damaged, he was aware of facts sufficient to put him on notice that he had suffered an injury as a result of Leo's wrongful conduct. There can be no doubt that by one year later, in May 1999, at the very latest, the Homeowner was aware of facts sufficient to put him on notice pursuant to the discovery rule.

The only argument the Homeowner makes against the running of the statute of

-16-

limitations is that since the second renewal "did not end until June 11, 2000, ... the one year statute of limitations expired one year after the second renewal period ended, i.e., June 11, 2001." The Homeowner offers no authority in support of his argument, and we are unable to see how that would be true under the facts of this case. The statute ties accrual to the wrongful act and discovery of the wrongful act. As we have indicated above, these all came together, at the very latest, in May of 1999. Even if some of the damage happened late in the game during the period of the renewals, the Homeowner, who knew he had been harmed, was not entitled to wait until he knew the full extent of the wrongful acts of the harm inflicted. *Chambers v. Dillow*, 713 S.W.2d 896, 898 (Tenn. 1986). Accordingly, we hold that any claim based upon the TCPA was barred by the statute of limitations.

V.

The judgment of the trial court is affirmed in part and reversed in part. That part of the judgment awarding compensatory damages of $39,910.87 for breach of contract is affirmed. That part of the judgment awarding trebled damages and attorney's fees for violations of the TCPA is reversed. In our discretion, we tax the costs on appeal to the appellant, Leo's Exterminating Services, Inc. This case is remanded to the trial court for enforcement of the judgment, as modified, and for collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE